[No. S056659. Jan. 8, 1998.]

LOCKHEED INFORMATION MANAGEMENT SERVICES CO.,
Plaintiff and Appellant, v.
CITY OF INGLEWOOD, Defendant and Respondent.

## COUNSEL

Iverson, Yoakum, Papiano & Hatch, Patrick McAdam and Frederick B. Hayes for Plaintiff and Appellant.

Howard Rosten, City Attorney, Jack Ballas, Chief Assistant City Attorney, Lynn J. Willhite and Emmerline Foote, Assistant City Attorneys, Sanders, Barnet, Goldman, Simons & Mosk and Richard M. Mosk for Defendant and Respondent.

Casey Gwinn, City Attorney (San Diego) and Leslie J. Girard, Assistant City Attorney, as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**BAXTER, J.**—Since 1992, the Vehicle Code has treated most parking violation notices as noncriminal matters, subject to civil penalties which are assessed, collected, and retained by the issuing jurisdictions (i.e., issuing agencies) themselves, pursuant to specified administrative procedures. The

judicial system is involved only when a violation notice is appealed beyond the administrative level, or when administrative means of collecting delinquent penalties have failed.

Vehicle Code[1] section 40200.5, subdivision (a) (section 40200.5(a)) provides that if an issuing agency does not wish to "process[]" its own violations at the administrative level, it "may elect to contract with the county, with a private vendor, or with any other *city or county processing agency . . . within the county,* . . . for *the processing* of notices of parking violations and notices of delinquent parking violations" at pre-judicial stages. (Italics added.)

The City of Inglewood (Inglewood), located in Los Angeles County, offers parking citation management assistance by contract to other issuing agencies. A central feature of Inglewood's citation management system is a software program developed by Inglewood that permits Inglewood's mainframe computer, located in Inglewood's city hall, to electronically perform or facilitate certain steps in the administration and disposition of citations issued by the agencies with which Inglewood contracts. Inglewood offers these services to agencies both within and without Los Angeles County, at standard rates per citation which are calculated only to defray Inglewood's costs of developing and operating the system.

Inglewood can and will provide greater or lesser levels of assistance depending on the issuing agency's location and individual needs. With respect to agencies situated outside Los Angeles County, Inglewood typically proposes a limited services arrangement. Under this option, Inglewood disclaims responsibility for the major discretionary functions associated with the administration of parking citations, including the physical receipt of parking penalty payments, and the treatment and disposition of motorist inquiries and contested citations. Those matters are left to the issuing agency. Inglewood's principal involvement is that its computer executes certain reporting, recordkeeping, information retrieval, and notification functions of a routine and nondiscretionary nature in response to data, commands, or inquiries entered by the issuing agency itself from its own remote terminals.

When the City of San Diego (San Diego), a municipality in San Diego County, sought bids from providers of citation management services, Inglewood responded by proposing such a limited service package. Lockheed Information Management Services Co. (Lockheed IMS), a competitive bidder, thereupon sought injunctive relief against Inglewood. Lockheed IMS

---

[1] All further unlabeled statutory references are to the Vehicle Code.

argued that Inglewood, as a "city . . . processing agency" located in Los Angeles County, was violating the "within the county" restriction of section 40200.5(a) by undertaking to "process[]" violation notices for cities, such as San Diego, which were located in other counties. The trial court denied a preliminary injunction, but the Court of Appeal reversed.

We granted review to consider the effect of section 40200.5(a) on the citation management services offered by Inglewood outside its own county, as in the case of San Diego. We first conclude that unless prohibited by section 40200.5(a), Inglewood has municipal authority to contract with other issuing agencies to assist them in administering their pending parking citations. We further determine—to the extent the limited record developed at this early stage of the litigation permits us to do so—that the particular services Inglewood apparently wishes to provide to issuing agencies outside its own county do not render Inglewood a "processing agency" engaged in "the processing" of the issuing agencies' citations, and are thus not activities which might be prohibited by section 40200.5(a). We will therefore reverse the judgment of the Court of Appeal.

We caution, however, that the procedural posture of this case necessarily narrows the scope of our ruling. We express no view on the legal import of facts which may develop in a full trial on Lockheed IMS's prayer for permanent injunctive relief. To the extent such facts differ substantially from those apparent on the current record, they may present issues as yet undeveloped, and thus not properly before us at this preliminary stage of the litigation.

### FACTS

In May 1994, San Diego issued a "Request for Proposal for Parking Citation Processing Services" (RFP), seeking bids on certain services to be performed with respect to the disposition of some 50,000 parking citations issued by San Diego each month. (RFP §§ 2.1, 5.0.) The RFP explained that computerized "data processing" services for San Diego's parking citations were currently being performed by a system installed in 1978 that was now obsolete. (RFP § 2.1.) Accordingly, San Diego required a new on-line "Data Processing system to support the operational demands of [San Diego's] Parking Management Division [(the Division)]." (RFP § 5.0.)

Under the RFP, new vendors were invited to bid on either of two service options. A limited "Systems Requirements" option would involve only "data processing," while a "Full Service Option" would encompass "the complete processing of parking citations," including physical receipt of payments, full

responsibility for handling "customer inquiries" from a local office maintained by the vendor, "administrative investigation of contested violations," and "interface with the Administrative Adjudication program." (RFP §§ 2.1, 5.0, 5.2.)

Pursuant to the RFP, the Systems Requirements, or data processing, option must have the capability to "maintain a complete and accurate data base of all parking citation" and related information, as derived from "processing transactions" entered onto the system by the Division. (RFP § 5.1.) Specifically, this option must be able to record the legally pertinent details of each citation. (RFP § 5.1.1.) It must automatically generate and mail various notices (including notices of payment delinquency, scheduled administrative hearing dates, hearing officer determinations, and balances due after partial payment) and routine correspondence according to San Diego's designs and specifications. (RFP §§ 5.1.2, 5.1.3.)

In addition, an acceptable system of this kind must maintain complete and current payment records based on "input" from the San Diego Treasurer's Department (Treasurer). (RFP § 5.1.3.) The system must accept administrative appeal fees and facilitate scheduling of administrative and court hearings. (*Ibid.*) It must "interface" with the California Department of Motor Vehicles (DMV), and with out-of-state motor vehicle departments, to obtain registration information. (RFP § 5.1.4.) The DMV interface must also be able to place and release DMV registration "holds" for nonpayment of delinquent citations "in accordance with standards set by . . . San Diego, the California Vehicle Code and any other applicable law." (*Ibid.*) Finally, the system must produce all appropriate accountings and reports. (RFP §§ 5.1.6-5.1.7.)

Inglewood elected not to bid on the Full Service Option. In response to the Systems Requirements or data processing option, Inglewood submitted a proposal entitled "Professional Services Agreement and Services to be Provided" (PSA).[2]

The PSA asserted that Inglewood would provide San Diego "on-line access to a computer system ('the System') which will facilitate the entry,

---

[2]Though Inglewood was already providing computerized parking ticket services to several California cities within and without Los Angeles County, Inglewood's offer of service to San Diego, in direct competition with Lockheed IMS, was the apparent genesis of Lockheed IMS's lawsuit. However, in one of the many record difficulties arising from the hasty litigation of this preliminary injunction proceeding, Inglewood never proffered a copy of its PSA to the trial court. Lockheed IMS submitted a copy only after the preliminary injunction hearing, while a decision of the matter was still pending. Inglewood objected that introduction of the PSA was untimely. The trial court did not rule on the objection, did not expressly receive the document in evidence, and did not mention it in the terse minute order denying an injunction. The Court of Appeal, however, deemed it appropriate to rely heavily on the PSA

modification, or deletion of parking citation . . . information, including payment of parking citations, from hard copy source documents or electronically transmitted data, or both, and permit the exchange of such data between [San Diego] and Inglewood." (PSA § 1.1.1.) This access would permit direct connection to the DMV's computer in order to process information, comply with laws and DMV procedures, and "engag[e] in other necessary actions," including "the placing and removal of [registration] holds by . . . Inglewood . . . in accordance with [standards] established by [San Diego]." (PSA §§ 1.1.2, 1.1.3.) System access would also "facilitate the accurate tracking of delinquent Cites" as well as implementation of "procedures for processing, mailing, and verifying" vehicle registration information. (PSA § 1.1.5.)

Specifically, under terms of the PSA, San Diego would transmit daily to Inglewood's computer, by means of compatible terminals to be supplied by Inglewood, all citations written by hand or by portable mechanical ticketwriters. (PSA §§ 1.1.5, 2.) The system would then screen each citation for "processability," identify and verify the registered owners of cited vehicles, generate and mail delinquency notices on forms specified by San Diego, and automatically place and remove DMV registration holds for citation nonpayment as provided by the Vehicle Code. (PSA § 2.)

Inglewood's PSA also contained detailed responses to all other requirements specified by the Systems Requirements or data processing option in San Diego's RFP. These included provisions for complete payment recordkeeping (based on data supplied by San Diego), scheduling and noticing of administrative hearings for contested violations, generation and mailing of notices of hearing disposition, production of reports, audits, security, and training. (PSA §§ 5.0-5.1.1.2.22.) The delineated services would be provided at a flat rate of 75 cents per citation. (PSA § 9.3.1.)

The PSA also made provision for "on-line cashiering" entries between San Diego and Inglewood. While the PSA suggested that Inglewood could, if necessary, provide assistance with actual cash processing and with handling

as an exemplar of the services Inglewood offered to ticketing agencies outside Los Angeles County. As the Court of Appeal observed, "[a] declaration [accompanying the proffered PSA] explained that Lockheed IMS had not been able to obtain the proposal before the hearing. . . . [W]e conclude that the trial court could properly consider all this post-hearing material. The proposal was relevant to the issues before the court, and Lockheed IMS did not possess it at the time of the hearing. By the same token, the information in Inglewood's responsive declaration explained the status of its post-hearing negotiations with San Diego." Inglewood still does not concede the PSA was admissible, but Inglewood does not expressly pursue its objection, and the effect of the PSA is discussed in Inglewood's briefing here. Like the Court of Appeal, we therefore consider it.

telephone inquiries by cited motorists, it recommended that San Diego retain these functions and disclaimed any desire by Inglewood to assume such responsibilities under the limited Systems Requirements option. (PSA § 9.3.2.(2-4).) Inglewood's PSA nowhere offered to take any responsibility for resolving contested citations.

On November 2, 1994, Lockheed IMS filed the instant action against Inglewood, seeking mandamus, injunctive, and declaratory relief. Lockheed IMS alleged that Inglewood, a city located in Los Angeles County, was already engaged in the business of "processing" parking violation citations for issuing agencies outside that county, including the cities of Sacramento, Berkeley, and Palo Alto, and was currently bidding to provide such services to San Diego, which was also situated outside Los Angeles County. By providing and offering such services to agencies in other counties, Lockheed IMS asserted, Inglewood was in violation of section 40200.5(a), which prohibits any "city . . . processing agency" from contracting to engage in "the processing" of parking violation citations for issuing agencies not "within the [same] county."

According to the complaint, Inglewood's illegal conduct was statutorily enjoinable under the Unfair Competition Act (Bus. & Prof. Code, §§ 17200, 17203 (UCA)). The complaint further stated that Lockheed IMS had a beneficial interest as a private competitor of Inglewood in the business of "processing" parking violations. Lockheed IMS would suffer irreparable injury, the complaint alleged, unless Inglewood's current and threatened conduct in violation of section 40200.5(a) was declared unlawful and Inglewood was ordered to end all such conduct.

As pertinent here, the complaint prayed for a writ of mandate ordering Inglewood to cease all activities in violation of section 40200.5(a), including all activities under existing "processing" contracts with agencies outside Los Angeles County, and to terminate such contracts. The complaint also sought a temporary restraining order, and preliminary and permanent injunctions, barring Inglewood from "processing" parking citation notices for agencies outside Los Angeles County, and from "engaging in efforts to obtain contracts" which would lead to the performance of "processing" services for such agencies in violation of section 40200.5(a).

The complaint was accompanied by an "Ex Parte Application for Issuance of Temporary Restraining Order and Order to Show Cause re Issuance of a Preliminary Injunction" (application). In the application, Lockheed IMS sought an immediate temporary restraining order (TRO) to preclude Inglewood from "(a) attempting to obtain contracts, to provide services of any

type or kind referred to as or related to the processing of parking violations for issuing agencies that are not within the County of Los Angeles, including but not limited to the City of San Diego; and (b) accepting or executing or preparing to accept or execute any [such] contract . . . ."

Attached as exhibits and appendices to the application, inter alia, were a declaration and documents purporting to bear on "processing" relationships Inglewood had already entered with cities such as Berkeley, Sacramento, and Palo Alto.[3] However, the application's memorandum of points and authorities represented that while Lockheed IMS was "ultimately seeking relief" against Inglewood's "existing contracts" with agencies outside Los Angeles County, the status of those contracts would be reserved for the trial on permanent relief. Meanwhile, the memorandum of points and authorities stated, "this ex parte application for a [TRO] and order to show cause re preliminary injunction pertains [only] to Inglewood's actions to obtain *new* contracts or business from issuing agencies not within Los Angeles County, including but not limited to . . . San Diego." (Italics added.)

On the same day the complaint and application were filed (November 2, 1994), the trial court conducted a TRO hearing, with counsel for both parties present. James R. Nyman, Inglewood's director of management services, testified at the hearing. Asked by the court to describe the services Inglewood was offering to San Diego and other cities, Nyman explained: "It is simply a computer program that runs on our . . . main frame in Inglewood

---

[3]These materials were submitted through the attached declaration of Lockheed IMS's senior vice-president, Matthew Silverman, which declaration also disclosed that Lockheed IMS had submitted a competitive bid to supply "similar services" to San Diego. The Silverman declaration describes, as appendices thereto, bid requests from Sacramento and Berkeley, Inglewood's bid response to Sacramento, Inglewood staff documents purporting to evidence Inglewood's actual entry of a "processing" agreement with Sacramento, and Inglewood City Council minutes approving an extension of Inglewood's "processing" agreement with Palo Alto. The declaration further states Silverman's "personal[] know[ledge]" that Inglewood had entered a "processing" contract with Berkeley. However, in the record on appeal, the materials described as attached to the Silverman declaration do not immediately follow it; instead, purported copies of these materials are provided at other locations in the appellant's appendix. Inglewood correctly notes that, as presented in the appellant's appendix, these materials are undated, unverified, and unauthenticated, but Inglewood does not explicitly dispute their accuracy. For whatever evidentiary value they have, the documents purporting to detail Inglewood's arrangements with Berkeley and Sacramento appear substantially consistent with Inglewood's offer to San Diego. Despite variations in wording, the essence of each arrangement is Inglewood's provision of its computer and software to facilitate electronic transactions which the issuing agencies themselves initiate by means of their direct data entries into Inglewood's computer. As in the San Diego proposal, there is minimal involvement by human employees of Inglewood. Inglewood itself takes no discretionary responsibility for initiating any processing transactions, for contact with cited motorists, for receipt and deposit of cash payments, or for resolution of contested citations.

. . . . [¶] It is a software application that allows people to connect up from remote terminals and allows them to data entry their citations, to process their customer inquiries, to batch or on-line entry their cash payments, for them to place and release DMV registration [holds] at Sacramento; for them to originate reports and print those reports at their city. . . . [¶] They can schedule hearings for their people; they can conduct those hearings and put the dispositions in. They can conduct administrative reviews and put the decisions in."

Nyman insisted that under this limited form of service, which Inglewood was bidding for in San Diego and already provided to Berkeley and Sacramento, Inglewood furnished the "software and the recurrent training and the support so [the issuing jurisdictions] can process their [own] parking tickets." When asked what "actual services" occurred *in Inglewood* under this option, Nyman replied, "Well, just the computers are attended to by the computer operators." Nyman added, "We don't process their data. They process their data."

Nyman contrasted this electronic citation management system, operated by the issuing jurisdiction through its own data entries into Inglewood's computer, with the so-called "full service" option Inglewood was reluctantly providing to certain agencies within Los Angeles County. Under this latter option, Nyman indicated, "[t]hey issue their parking tickets; they mail them to us; we put them into the computer; we validate that they are okay; we look up the registered owner and send out the notices. [¶] When somebody calls in and requests an administrative review, that says I shouldn't have gotten this ticket, if it is something we can handle, we handle it . . . ."[4] On cross-examination, Nyman disclosed that Inglewood's services were offered on a nonprofit basis, and that prices were set to reflect Inglewood's overall costs of developing, implementing, and maintaining the system.

The court, per Judge Geernaert, issued the TRO as requested. The court acknowledged that, in essence, the evidence submitted at the TRO hearing indicated Inglewood was offering only computerized "data processing" services to San Diego and other cities outside Los Angeles County. However, noting the apparent exemption of *private* vendors from the "within the county" provision (see discussion, *post*), the court reasoned that the "obvious[]" purpose of section 40200.5(a) is to bar a public agency from competing with private vendors for any form of assistance in "processing" another

---

[4]Nyman also noted other services that might be provided under a "classical" full service option. "In a number of cities," he explained, "the city, the [issuing] agency, writes the parking citations and everything from there on is handled by the [processing] agency; that is called full service processing. [¶] And down from telephone correspondence through accepting of the payment through data entry of the payment, boxing of the cash and all of this stuff . . . ."

agency's parking tickets, except when both agencies are within the same county. As the court succinctly remarked, "I don't think [Inglewood] can offer to process *information* for San Diego *using their main frame in Inglewood*." (Italics added.)

At the same time, the court issued an order to show cause whether a preliminary injunction against future contracts, worded identically to the TRO, should be granted pending a determination of the merits (OSC re preliminary injunction). Thereafter, Judge Geernaert recused himself, and the case was reassigned to Judge Grover.

The OSC re preliminary injunction was heard on February 16, 1995.[5] During a wide-ranging argument, Inglewood's counsel observed that there might be considerable variance in how Inglewood henceforth marketed its computerized citation management system. Depending on customer needs, counsel suggested, human employees of Inglewood might have lesser or greater participation in any arrangement using Inglewood's computer, and Inglewood might even provide software directly to a customer for use in the customer's own computer system.[6] However, counsel suggested, no future contract would violate section 40200.5(a) because customers outside Los Angeles County would remain responsible for all "due process" and "public relations" aspects of their ticket processing, including physical collection of cash payments, receipt and handling of inquiries from ticket recipients, and administrative disposition of contested citations.

In stark contrast, counsel for Lockheed IMS urged in effect that section 40200.5(a) prohibits Inglewood from directly performing *any* service connected with the management, administration, or disposition of a parking ticket issued outside Los Angeles County. Thus, counsel asserted, although Inglewood may perhaps furnish its citation management software to agencies outside Los Angeles County for their own use, *Inglewood*'s computer may not be used to perform electronic transactions for such agencies, even if the transactions are initiated by the agencies themselves.

On June 13, 1995, the trial court denied a preliminary injunction. Lockheed IMS appealed from the denial order.

---

[5]Prior to the hearing, Inglewood filed a memorandum of points and authorities in opposition to a preliminary injunction. Attached, inter alia, were declarations by officials of Palo Alto and Sacramento who insisted that those cities also "process[]" their own parking tickets, simply using Inglewood's computer and software for that purpose. A declaration by Inglewood official Nyman, who had generally described Inglewood's services at the TRO hearing, confirmed that any arrangement ultimately consummated between Inglewood and San Diego would take the same form.

[6]These observations occurred in the context of counsel's argument that a preliminary injunction would be "premature," since it was not yet clear what enjoinable acts Inglewood was actually threatening to do.

The Court of Appeal reversed.[7] The court first resolved preliminary issues concerning the standards for issuance of a preliminary injunction. It concluded, inter alia, that Lockheed IMS was entitled to preliminary relief pending a full trial of the underlying issues if Lockheed IMS demonstrated it was likely to prevail on the merits after a full trial, and Inglewood failed to show that the "balance" of interim harm rendered a preliminary injunction inappropriate in the particular case.[8]

Next, the Court of Appeal concluded that Lockheed IMS had demonstrated a probability its underlying claim for an permanent injunction under the UCA would succeed. Insofar as pertinent here, the court reasoned as follows: Inglewood threatens to commit unfair competitive acts, within the purview of the UCA, by violating section 40200.5(a). By the plain meaning of the word "processing," even the limited activities Inglewood proposes would cause it to be engaged, as a "processing agency," in the "processing" of parking tickets for issuing agencies located in other counties.[9] Alternatively, if Inglewood is not a "processing agency," the statute does not otherwise authorize Inglewood to contract for services related to parking citation administration.

Finally, the Court of Appeal concluded for several reasons that a preliminary injunction would cause no irreparable interim harm to Inglewood. On remand, the trial court was therefore directed "to issue a preliminary injunction enjoining Inglewood from accepting or executing any future contracts to process notices of parking violations for issuing agencies located outside Los Angeles County." The Court of Appeal made clear that this wording was intended to preclude Inglewood from contracting to perform any direct step

---

[7]As the Court of Appeal noted, San Diego had awarded no contract as of the date of the decision on appeal. We have no information that the situation has changed.

[8]In this regard, the Court of Appeal reasoned that because Lockheed IMS had asserted a violation of the UCA, a statute specifically authorizing injunctive relief, the applicable standards were those set forth in *IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 72-73 [196 Cal.Rptr. 715, 672 P.2d 121]. This portion of the Court of Appeal's analysis is not before us on review, and we do not address it.

[9]The Court of Appeal specifically rejected Inglewood's claim that insofar as Inglewood is providing mere "data processing" services, its activities do not violate section 40200.5(a). The court noted that "the plain meaning of 'process' is 'to subject to a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result . . . as . . . to subject to rapid examination and handling designed to dispose of routine details (as by recording preliminary data of or about) . . . [or] to subject to examination and analysis.' (Webster's New Internat. Dict. (3d ed.) p. 1808, col. 1.)" Under this definition, the Court of Appeal ruled, "to the extent Inglewood uses its mainframe [computer] to examine or analyze data concerning San Diego parking citations, it is 'processing' those citations [in violation of the statute] even if it does not provide every conceivable type of service related to the administration of a parking citation system."

or function in the administration, management, or disposition of such agencies' pending citations.

We granted review, expressly limited to issues concerning the effect of section 40200.5(a) on the parking citation management services offered by Inglewood outside Los Angeles County (See Cal. Rules of Court, rule 29.2(a) & (b).) We turn to an examination of those questions.[10]

## DISCUSSION

1. *Absent any restriction imposed by section 40200.5(a), are Inglewood's proposed services outside Los Angeles County within its municipal powers? Yes.*

■ Defending the propriety of injunctive relief, Lockheed IMS argues at the outset that section 40200.5(a) does not simply limit authority Inglewood would otherwise have to contract for parking citation assistance to other agencies. Instead, Lockheed IMS urges, this statute constitutes the sole and exclusive grant of municipal power to contract with other agencies for the provision of such services. Lockheed IMS insists that because section 40200.5(a) expressly authorizes only certain kinds of ticket "processing" contracts and permits such contracts only among agencies within the same county, no further authority exists, and the services Inglewood seeks to provide outside Los Angeles County are thus ultra vires. The Court of Appeal embraced similar reasoning.

We disagree that Inglewood lacks all authority to offer assistance with parking tickets except such authority as section 40200.5(a) itself might expressly confer. Inglewood cites several statutes aside from section 40200.5(a) which, in Inglewood's view, empower it to offer services, including parking citation management services, to other municipalities. However, we need look no further than the body of statutes that expressly permit local agencies to contract with one another for the provision of municipal services and functions.

In particular, Government Code section 54981 authorizes "[t]he legislative body of any local agency to contract with *any other* local agency for the

---

[10]An amicus curiae brief in support of Inglewood was filed by the cities of Albany, Bakersfield, Berkeley, Burbank, Chula Vista, Culver City, Eureka, Glendale, Huntington Beach, Long Beach, Los Angeles, Merced, Monterey, Napa, Palm Desert, Port Hueneme, Roseville, Sacramento, San Diego, San Luis Obispo, and Vernon. The amicus curiae brief argues the issues on terms roughly equivalent to those presented by Inglewood itself. Therefore, when the arguments on appeal are hereafter described, amici curiae and Inglewood will be referred to interchangeably as "Inglewood."

performance by the latter of municipal services or functions within the territory of the former." (Italics added.) For this purpose, the Government Code defines " '[l]ocal agency' " to include "any . . . city . . . which provides or has authority to provide or perform municipal services or functions." (*Id.*, § 54980, subd. (b).) "Municipal services or functions" are defined as "includ[ing], *but . . . not limited to*, firefighting, police, ambulance, utility services, and the improvement, maintenance, repair, and operation of streets and highways." (*Id.*, subd. (c), italics added.) No municipal "service[]" or "function[]" for which one city might contract with another is specifically excluded from the statutory definition. (*Ibid.*)

By expressly authorizing local agencies, including cities, to contract with other qualified local government agencies for the *receipt* of municipal services or functions, the statute necessarily furnishes implicit contractual authority to the *providing* agencies as well.[11] Moreover, by conferring contractual authority on every city, county, and district "which provides or has authority to provide or perform municipal services or functions" (Gov. Code, § 54980, subd. (b)), and by incorporating a broad, diverse, and inclusive definition of "[m]unicipal services or functions" (*id.*, subd. (c)), the statutory scheme suggests that under Government Code section 54981, local agencies may contract with each other for the provision and receipt of any service or function which they are authorized to perform by or for themselves in the legitimate exercise of their municipal affairs.

Nor does Government Code section 54981 limit its scope by specifying that one local agency may contract with another for the latter's performance of services "within the territory of the former." By use of this phrase, the statute cannot reasonably be read to imply that one agency may perform contract services for another *only if* its activities occur inside the physical boundaries of the receiving agency. Such an interpretation would be arbitrary and illogical. By its terms, the quoted phrase simply recognizes that such contracts *may require* one agency to act within the territory of another, and makes clear that this is *no limit* on the authority conferred. The greater power to act within another agency's territory necessarily implies the lesser power to perform for another agency those ancillary "municipal services or functions" that require no such territorial invasion.

---

[11]This implication is reinforced by Government Code section 54983, which provides, inter alia, that Government Code section 54981 "shall not be construed as authorizing . . . any local agency to enter into an agreement for the *providing* of municipal services or functions which it is prohibited to provide by law or which exceeds the force account limit applicable to the local agency contracting to receive such services." (Italics added.) In other words, contractual authority *is generally* conferred on the providing agency, subject to the limits set forth in Government Code section 54983.

The declared purpose and sparse legislative history of Government Code section 54981 are consistent with these conclusions. Adopted in 1978 (see Stats. 1978, ch. 960, § 1, p. 2961), the statute was intended to "supplement[]" existing laws which already authorized certain kinds of interagency service contracts. (Gov. Code, § 54983; see also Governor's Office of Planning & Research, Enrolled Bill Report (Sept. 13, 1978), contained in Governor's chaptered bill file (1977-1978 Reg. Sess.) ch. 960.) The existing statutes permitted a county to contract to perform municipal "functions" for a city located therein (Gov. Code, §§ 51301 [general law city], 51330 [charter city]) and allowed any local agency to contract with any other for police and fire protection (id., § 55632). The new section broadened these powers by providing that all local agencies, regardless of location or nature, could enter agreements with each other for the performance of "[m]unicipal services or functions" of diverse kinds. (Gov. Code, §§ 54980, subd. (c), 54981.)[12]

As noted above (fn. 11, ante), Government Code section 54983 declares that Government Code section 54981 does not grant the authority to contract for services which the providing agency "is [otherwise] *prohibited* to provide by law," or which exceed the receiving agency's "force account limit." (Gov. Code, § 54983, italics added.)[13] But from these provisions, the converse inference equally arises; i.e., that "contract service" authority *is* conferred *except* in the circumstances expressly enumerated by the statute.

We therefore conclude that unless the particular category of contracts Inglewood proposes to enter is prohibited by specific provisions of law (see discussion, *post*), Government Code section 54981 authorizes Inglewood to contract with other local agencies, both within and without Los Angeles County, for assistance in the management and disposition of their parking citations. The administration of parking tickets is a core "municipal . . . function[]" which Inglewood is authorized to perform for itself, and which its customer agencies, in the proper administration of their own municipal affairs, are likewise authorized, and would otherwise be required, to perform for themselves. Under Government Code section 54981, such functions may

[12]According to the Enrolled Bill Report prepared by the Governor's Office of Planning and Research (see *ante*, this page), the bill containing new Government Code section 54981 (Sen. Bill No. 2163 (1977-1978 Reg. Sess.)) was introduced at the request of Ventura County, which wished to contract with the *neighboring county* of Kern for the latter's maintenance of roads in a remote area of Ventura County located near the Kern County boundary.

[13]"Force account limit[s]" have to do with ceilings imposed by the Local Agency Public Construction Act (Pub. Contract Code, § 20100 et seq.) on the monetary value of public works construction, repair, and maintenance projects which local agencies may perform for themselves without "contracting out" the work to private bidders. No such issues are presented by this case.

therefore be the subject of a "contract service" agreement between Inglewood and any other such "local agency," regardless of their geographic relationship, as the contracting parties deem in their best interests, with the sole proviso that such contract not be otherwise prohibited. Accordingly, we turn to the issue whether such a prohibition exists in this case.

*2. Are Inglewood's services outside Los Angeles County prohibited by section 40200.5(a)? No.*

Inglewood argues vigorously that the services it provides in connection with parking citations issued outside Los Angeles County are not prohibited by section 40200.5(a). Insofar as the record on preliminary injunction discloses, Inglewood is correct.

The Vehicle Code provides that an issuing agency may be its own agent for "processing" its violation notices. (§ 40200.3, subd. (a).) However, the issuing agency may also elect to contract with "the county, with a private vendor, or with any other city or county *processing agency,* other than the Department of the California Highway Patrol or other state law enforcement agency, *within the county* . . . for *the processing* of notices of parking violations and notices of delinquent parking violations" prior to court proceedings. (§ 40200.5(a), italics added.)

For purposes of section 40200.5(a), a "processing agency" is *"the* contracting party responsible for *the processing* of the notices of parking violations and notices of delinquent parking violations." (§ 40200.6, subd. (a), italics added.) While the statutory scheme sets forth numerous specific responsibilities of "processing agenc[ies]," whether or not they are the issuing agencies (see discussion, *post*), it nowhere defines "processing."

As below, Inglewood argues that any statutory limitation on intercounty contracts for citation management assistance extends only to arrangements by which one public entity becomes another's "processing *agency" responsible for "the* processing" of the other's parking tickets. A service provider does not assume the status of a "processing agency," Inglewood asserts, unless it agrees to perform *all* the functions assigned to a "processing agency" by the statutes. In Inglewood's view, this interpretation comports with the purpose of the geographical restriction, which is simply to ensure that "those activities directly affecting [the] rights or physical convenience [of cited motorists] be conducted near where the violation occurred," not to affect mere "logistical support" arrangements to which the citee is indifferent.

Inglewood insists that the mere "data processing" services it offers do not make it the "processing agency" for its customers, engaged in "the processing" of their tickets. As Inglewood observes, it simply furnishes a computer,

software, and incidental employee assistance to perform and record routine electronic, mailing, scheduling, and reporting transactions requested or initiated by the issuing agencies themselves. Under these circumstances, Inglewood concludes, the vendees of its services remain their own "processing agenc[ies]," which may contract for subordinate logistical support and assistance without geographical restriction.

Lockheed IMS acknowledges that section 40200.5(a) "must be interpreted as providing an issuing agency with sufficient flexibility to contract . . . for data processing services" so that it can "benefit from certain economies and efficiencies provided by data processing in connection with parking violation notices."[14] Moreover, though Lockheed IMS does not concede that Inglewood's services constitute mere "data processing," there appears to be no fundamental dispute about the categories of services Inglewood offers.

Nonetheless, Lockheed IMS insists that section 40200.5(a) prohibits any and all contracts by which one public agency directly assists another agency in a different county with the management, administration, or disposition of the latter's pending parking citations. Lockheed IMS urges that when Inglewood arranges with an agency outside Los Angeles County to "download" the latter's parking tickets into Inglewood's computer, so that Inglewood's equipment and employees are directly involved in the generation and mailing of notices, placing of DMV holds, scheduling of administrative hearings, maintenance of current status information, recordkeeping, and production of reports, Inglewood is violating the statute by contracting to "process[]," at least in part, the other agency's tickets. These conclusions, according to Lockheed IMS, are compelled by the plain meaning of "processing," and by the statutory purpose to limit competition by public agencies against private vendors of citation management services.

We agree with Inglewood that even if construed as a positive prohibition on interagency ticket "processing" contracts except "within the [same] county," section 40200.5(a) does not prohibit the particular services Inglewood represents on this record it is offering to issuing agencies outside Los Angeles County. We explain our reasoning in detail.

At the outset, we reject the conclusion of the Court of Appeal, advanced by Lockheed IMS here, that the meaning of the term "processing," as used in

---

[14]For example, Lockheed IMS suggests, an issuing agency might rid itself of bulky filing cabinets by contracting outside its county for electronic *storage* of parking tickets that have been finally resolved. Moreover, Lockheed IMS concedes, statutory law (Gov. Code, § 6254.9, subd. (a)) provides express authority for Inglewood to sell, lease, or license its software to issuing agencies in other counties for use by the issuing agencies themselves, as Inglewood has indicated it would consider doing.

section 40200.5(a), is "plain." The dictionary definition of "process" upon which the Court of Appeal relied (see fn. 9, *ante*) can equally be applied, in context, to an *entire* system by which transactions are managed, organized, analyzed, manipulated, and recorded in order to achieve a particular result, or to *any discrete portion* of that system. Thus, even if section 40200.5(a) limits the authority of one public agency to contract with another outside its own county "for *the processing* of [the latter's] notices of parking violations and notices of delinquent parking violations" (italics added), the italicized words do not make clear whether the limitation extends to *every individual segment or aspect* of such "processing," as Lockheed IMS asserts, or only to an entire transfer of the "processing" responsibility, as Inglewood maintains.

We must therefore ascertain which of these contexts was intended by the Legislature when it adopted the "within the county" language now contained in section 40200.5(a). Our task is complicated. The provision for interagency "processing" contracts "within the [same] county" was added nearly two decades ago to a statutory system far different from today's, as an incidental feature of a bill focused on issues greatly removed from those we consider here. Though both this original bill and the several more recent overhauls of the parking citation statutes carry extensive legislative histories, the parties have cited, and we have found, no reference to the Legislature's intent in providing specifically that public agencies "within the [same] county" may enter "processing" contracts. Nonetheless, our review of the evolving statutory scheme persuades us that Inglewood has the better argument.

The crucial statutory phrase dates from 1980. It was included in a bill designed to untangle fiscal and jurisdictional issues which had arisen under a parking citation system radically different than that now in effect. At that time, a parking violation was an infraction under the Vehicle Code. Accordingly, the citation for such a violation set forth a notice to appear in municipal court and an amount of "bail." If the motorist paid the bail amount, then failed to appear and contest, bail was "forfeited," and no further proceedings occurred. If, and only if, the motorist failed either to deposit bail or to appear and contest after delinquency notices were sent, a "complaint" could be filed, whereupon an arrest warrant could issue, or the DMV might be notified to withhold registration renewal until the bail and additional service charges were paid. (*Board of Trustees* v. *Municipal Court* (1979) 95 Cal.App.3d 322, 323-326 [157 Cal.Rptr. 133] (*Board of Trustees*) and statutes cited.)

Prior to 1980, Penal Code section 1463 provided, inter alia, that ". . . Vehicle Code fines and forfeitures collected upon conviction or upon the

forfeiture of bail, together with moneys deposited as bail, *in any municipal or justice court*, shall, as soon as practicable . . . , be deposited with the county treasurer." (Pen. Code, § 1463, subd. (1), as amended by Stats. 1979, ch. 827, § 1, p. 2860, italics added.) Under former Penal Code section 1463, these funds were then allocated between the county and the agency which had issued the ticket, according to complicated statutory formulas.

Traditionally, the municipal courts administered the disposition of parking tickets at all stages after issuance of a citation. Forfeitures of bail collected by these courts both before and after the issuance of complaints were therefore distributed under the revenue-sharing formula of former Penal Code section 1463, with the county retaining a statutory share of all such forfeitures.

In the late 1970's, a number of municipal courts, citing lack of resources, declined to continue their administrative involvement with parking citations at stages prior to the filing of court complaints. Two Courts of Appeal thereafter agreed that municipal courts were not required to assume jurisdiction over parking tickets at precomplaint stages.

These courts reasoned as follows: The authority of municipal courts to accept and process parking citations was not expressly conferred by law, and the general rule, even for infractions, is that formal prosecution is necessary to invoke court jurisdiction. By contrast, disposition of tickets at the precomplaint stage was a mere administrative concern of the issuing agencies. The statutory references to precomplaint bail, and the forfeiture thereof, did not imply a need for judicial involvement, because these amounts, when paid by motorists in lieu of further proceedings, were not true bail or bail forfeitures, but simple fines or penalties to the ticketing jurisdictions. (*City of San Diego* v. *Municipal Court* (1980) 102 Cal.App.3d 775, 779 [162 Cal.Rptr. 420] (*San Diego*); *Board of Trustees, supra,* 95 Cal.App.3d at pp. 325-328.)

By the same token, the Courts of Appeal asserted, insofar as such precomplaint parking fines actually were collected by the issuing agencies themselves, rather than by the municipal courts, such funds did not come within the revenue-sharing formula of former Penal Code section 1463. Instead, the Courts of Appeal held, these sums could be retained in their entirety by the enforcing agencies themselves. (*San Diego, supra,* 102 Cal.App.3d at p. 779; *Board of Trustees, supra,* 95 Cal.App.3d at p. 327.)

We enhanced the jurisdictional and fiscal confusion by our subsequent decision in *County of Los Angeles* v. *City of Alhambra* (1980) 27 Cal.3d 184 [165 Cal.Rptr. 440, 612 P.2d 24] (*Alhambra*). There, the local municipal court discontinued its precomplaint involvement with parking citations on authority of *Board of Trustees*. In response, Alhambra adopted an ordinance authorizing the city itself to assess, collect, and retain fees for parking tickets paid prior to formal prosecution. We found this scheme inconsistent with, and preempted by, the Vehicle Code's comprehensive bail/notice system for illegal-parking penalties. (*Alhambra*, *supra*, 27 Cal.3d at pp. 189-193.) We further held that the county was entitled, under former Penal Code section 1463, to its statutory share of fees collected by Alhambra upon parking tickets issued by the city's officers under the invalid ordinance. (*Alhambra*, *supra*, 27 Cal.3d at pp. 193-194.) We acknowledged that the municipal court had abandoned the parking ticket processing services on which the county share of precomplaint bail forfeitures was presumably based, but we did not address the legality of the court's change of policy. Instead, we simply remarked that legislation might be necessary to adjust the statutory revenue-sharing formula "to reflect that change of function." (*Id.* at p. 194.)

To address these concerns, the Legislature enacted Assembly Bill No. 2392 (1979-1980 Reg. Sess.). Among other things, Assembly Bill No. 2392 amended former Penal Code section 1463 to retain the revenue-sharing formula for parking tickets only when bail forfeitures were actually collected by the county, or by a municipal or justice court. On the other hand, the amendment provided that "[n]otwithstanding any other provision of law, in the event that a county or court elects to discontinue *processing the posting of bail* for [a parking citation] issuing agency, the . . . issuing agency [itself] may elect to receive, deposit, accept forfeitures and otherwise *process the posting of bail* for parking violations," and if such an election is made, "the issuing agency may retain the forfeited bail collected. [¶] . . . [¶] [In such event,] [t]he issuing agency may [also] elect to contract with the county, a municipal or justice court, *or another issuing agency within the county* to provide for *the processing of the posting of bail* for such parking violations." (Former Pen. Code, § 1463, subd. (3), as amended by Stats. 1980, ch. 1275, § 1, p. 4314, italics added.)

The legislative history of Assembly Bill No. 2392 discloses extensive lobbying by cities and counties concerning the revenue-sharing issue. However, that history nowhere mentions the implications of the newly expressed authority to contract for "processing" services, and it provides no clue why

the authority described was limited to a geographic area "within the county."[15]

In 1986, the Legislature, through Assembly Bill No. 942 (1985-1986 Reg. Sess.), substantially revised and reorganized the parking ticket dispositional scheme in order to clarify the allocation of functions and revenues, strengthen due process protections, and ensure that parking violations were processed "in a uniform [and] consistent manner." (Stats. 1986, ch. 939, § 1, p. 3254.) Among other things, new sections 40200 et seq. were added to the Vehicle Code. (Stats. 1986, ch. 939, § 15, p. 3269 et seq.) This confirmed that courts need not administer violation notices prior to the filing of complaints, that issuing agencies themselves must take responsibility for that function if the courts declined to do so, and that precomplaint parking penalty revenues must be shared with the county if collected by the courts, but would otherwise be retained by the issuing agencies themselves. (§ 40200.4, former §§ 40200.1, 40200.2, subd. (a), 40200.3, 40226, as added by Stats. 1986, ch. 939, § 15, pp. 3269-3270, 3276.)

In language derived from the 1980 amendment to former Penal Code section 1463, new Vehicle Code section 40200.5(a) provided that when precomplaint "processing" responsibilities devolved upon the issuing agency, that agency could "elect to contract with the county, with the municipal or justice court of competent jurisdiction, *with a private vendor*, or with *any other issuing agency within the county*, . . . for *the processing* of parking violations and notices of delinquent parking violations," prior to the filing of court complaints. (*Ibid.*, as added by Stats. 1986, ch. 939, § 15, p. 3270, italics added.) The phrase "with a private vendor" had not appeared in the 1980 version of this provision.

The 1986 legislation also established new and detailed procedures for the "processing" of tickets prior to the filing of court complaints. These more

[15]Lockheed IMS stresses that Assembly Bill No. 2392 was supported by a broad spectrum of municipal interests, including the League of California Cities and a number of individual municipalities such as amici curiae Los Angeles and San Diego. Hence, Lockheed IMS suggests, cities "accepted" the bill's "within the county" limit on "processing" contracts. However, as noted, debate about the bill focused almost exclusively on the allocation of ticket revenues once processing responsibilities shifted from the courts to the issuing agencies themselves. Cities that issued parking tickets obviously supported the bill's provision that such revenues need not be shared with counties, as under the existing system, but could be entirely retained by agencies that assumed processing responsibility for their own tickets. Nothing in the legislative history cited by Lockheed IMS demonstrates any focus whatever on the "contracting out" provisions, including the "within the county" language. Hence, the general municipal support for Assembly Bill No. 2392 raises no inference that cities specifically "accepted," as limits on their powers, the expansive interpretation of section 40200.5(a) now advanced by Lockheed IMS.

clearly indicated the administrative nature of precomplaint treatment of such citations. Previous references to precomplaint bail and the forfeiture thereof were eliminated. Instead, local entities were authorized to establish penalties for parking violations in amounts conforming to the standard bail schedule. (§ 40203.5, as added by Stats. 1986, ch. 939, § 15, p. 3271.) If a "parking penalty" was paid within the time noticed on the ticket, proceedings would terminate. (§ 40204, as added by Stats. 1986, ch. 939, § 15, p. 3271.) If the motorist failed either to pay or to appear within the originally noticed time, he or she must receive a "notice of delinquent parking violation" which would warn of court proceedings including possible arrest, and of vehicle registration nonrenewal, upon failure to pay the parking penalty, or to appear, within a specified time. (§§ 40206, subd. (a), 40207, as added by Stats. 1986, ch. 939, § 15, pp. 3271, 3272.)

In response to either the original ticket or a delinquency notice for which no intervening complaint had been filed (see discussion, *post*), a cited motorist, acting within the noticed time, could appear and contest the ticket, or could make proof of nonliability for the cited vehicle. (§§ 40208-40210, former § 40215, subd. (a), as added by Stats. 1986, ch. 939, § 15, pp. 3272, 3274.) If investigation of a contested citation indicated no violation had occurred, or upon satisfactory proof of vehicle nonliability, the ticket must be cancelled. (§ 40209, former § 40215, subd. (a)(1), as added by Stats. 1986, ch. 939, § 15, pp. 3272, 3274.) Otherwise, the matter was referred for court proceedings, and jurisdiction then devolved exclusively on the court. (§§ 40210, subd. (c), 40220, former §§ 40215, 40219, as added by Stats. 1986, ch., 939, § 15, pp. 3272, 3274-3275.)

If a delinquency notice had issued, but no court complaint had yet been filed, the motorist could still end proceedings by paying the original penalty, plus any late charges. (§ 40211, subd. (b), as added by Stats. 1986, ch. 939, § 15, pp. 3272-3273.) In that event, any delinquency notice to the DMV, filed in lieu of a court complaint, must be recalled. (*Id.*, subds. (c), (d); see also § 40220, former subds. (b), (c), as added by Stats. 1986, ch. 939, § 15, pp. 3273, 3275.) If an intervening complaint had been filed, the court assumed exclusive jurisdiction, and a motorist attempting to pay the ticket thereafter must be referred to the court. (§ 40211, former subd. (e), former §§ 40215, 40230, as added by Stats. 1986, ch. 939, § 15, pp. 3273, 3274, 3276.)

Insofar as an issuing agency had assumed responsibility from the courts for "the processing" of its own tickets, then elected to contract for transfer of that function to another entity (thereafter referred to as "the processing

agency"), direct statutory responsibility for administering and enforcing this complex system at all precomplaint stages was expressly placed in the sole hands of this "processing agency," i.e., "the contracting party responsible for *the processing* of the [issuing agency's] notices of parking violations and notices of delinquent parking violations." (§ 40200.6, as added by Stats. 1986, ch. 939, § 15, p. 3270, italics added.) The statutory duties of the "processing agency" included the service and filing of all delinquency notices to cited motorists; the physical receipt of parking penalty payments; termination of proceedings upon payment of penalty; investigation and cancellation of contested tickets on grounds of nonviolation or proof of vehicle nonliability; filing, confirmation, and cancellation of DMV delinquency notices; filing and withdrawal of court complaints; and setting of court dates. (§§ 40205, 40206, 40206.5, subd. (b) and former subd. (d), 40209, 40210, 40211, 40220, 40221, 40222, former §§ 40215, 40219, 40223, 40230, subd. (a); see §§ 40200.4, 40200.5, subd. (b), former § 40200.3, all as added by Stats. 1986, ch. 939, § 15, pp. 3269-3276.)

Neither the language nor the lengthy legislative history of Assembly Bill No. 942 casts further light on the intended meaning of the terms "processing" and "processing agency" as used in the 1986 legislation, nor does it include any discussion of the addition of "private vendor[s]" to the list of entities with whom an issuing agency was expressly authorized to contract for "processing" services. Finally, as in the case of the 1980 legislation, Assembly Bill No. 942's history provides no clue about the purpose of the provision that among the entities with which an issuing agency could contract for processing services was another "issuing agency . . . *within the county.*" (Stats. 1986, ch. 939, § 15, p. 3270, italics added.)

In 1992, the Legislature enacted Assembly Bill No. 408 (1991-1992 Reg. Sess.), another substantial revision of California's parking ticket disposition scheme. (Stats. 1992, ch. 1244, § 1 et seq.) Treatment of parking violations as infractions was abolished. Under the new system, a cited motorist could respond in timely fashion to a first notice or delinquency notice by simply paying a "civil penalty," i.e., the amount of the "parking penalty" set by the jurisdiction where the violation occurred, in which case proceedings would terminate. (§§ 40203.5, 40204, 40206, subd. (a), 40206.5, subd. (a), 40207, as amended by Stats. 1992, ch. 1244, §§ 16, 17, 20, 21.) Alternatively, the motorist could make timely statutory proof of vehicle nonliability, or could timely contest the ticket. (§§ 40205, 40207, 40209-40211, former § 40215, as amended by Stats. 1992, ch. 1244, §§ 18, 21-24, 26.) If the third course was followed, the motorist dissatisfied with an "initial [administrative] review" of his case could, by "deposit[ing]" the amount of the penalty,

obtain a full administrative hearing, followed by de novo civil appeal in justice or municipal court. (Former §§ 40215, 40230, as amended by Stats. 1992, ch. 1244, §§ 26, 33.) On the other hand, final and unpaid penalties could be collected either by resort to the DMV when renewal of registration was sought, or, in certain circumstances, by filing proof of accrued uncollected amounts with the municipal court as a "civil judgment." (§§ 40220, 40221, as amended by Stats. 1992, ch. 1244, §§ 27, 28.)

As part of this revised system, any remaining involvement of courts in the "processing" scheme prior to the filing of civil judgments or actions was terminated. Courts still engaged in such "processing" activities were directed to enter agreements for the orderly transfer of these functions to the issuing agencies. (§ 40200.4, subd. (b), as amended by Stats. 1992, ch. 1244, § 11.) At the same time, section 40200.5(a) was altered to delete the authority of issuing agencies to contract with such courts to "process[]" their violation notices. As amended, section 40200.5(a) provided in general that "an issuing agency may elect to contract with the county, with a private vendor, *or with any other city or county issuing agency*, other than the . . . California Highway Patrol, *within the county*, . . . for *the processing* of notices of parking violations and notices of delinquent parking violations, prior to filing with the court . . . ." (Stats. 1992, ch. 1244, § 12, italics added.) The legislative history of Assembly Bill No. 408, like that of its predecessors, makes no mention of the provision limiting the statutory authority for "processing" contracts between public entities to those agencies "within the [same] county."

The 1992 statutes again placed upon the "processing agency" the bulk of responsibility for administering the system at all pre-court stages, and no change was made in the prior definition of the "processing agency" as distinct from the issuing agency.[16] While the governing body of the jurisdiction where the violation occurred had sole authority to set the schedule of penalties (§ 40203.5, subd, (a), as amended by Stats. 1992, ch. 1244, § 16), and the issuing agency itself must designate the hearing examiner for a contested citation (former § 40215, subd. (b)(3), as amended by Stats. 1992, ch. 1244, § 26), virtually all other procedural authority and discretion over a citation once issued was vested in the "processing agency." This included the mailing of delinquency notices (§ 40206.5, subd. (a), as amended by Stats. 1992, ch. 1244, § 20), the physical receipt and disbursement of

---

[16]As will be recalled, section 40200.6, adopted in 1986, provided that "[i]f a contract is entered into pursuant to [s]ection 40200.5, for the purposes of this article, 'processing agency' means the contracting party responsible for the processing of the notices of parking violations and notices of delinquent parking violations." (§ 40200.6, subd. (a).)

penalties and deposits (see §§ 40200.3, subd. (a), 40200.4, subd. (a), 40200.5, subd. (b), as added or amended by Stats. 1992, ch. 1244, §§ 10.2, 11, 12; but cf. §§ 40204, 40206, subd. (a), as amended by Stats. 1992, ch. 1244, §§ 17, 19), the investigation and "initial review" of a contested citation (unless the "processing agency" requested the issuing agency to perform this function) (former §§ 40200.7, 40215, subd. (a)(1), as added by Stats. 1992, ch. 1244, §§ 14, 26), the setting of administrative hearing procedures (former §§ 40200.7, 40215, subd. (b)(5), as added by Stats. 1992, ch. 1244, §§ 14, 26), the cancellation of tickets under appropriate statutory circumstances as determined by the "processing agency" (§§ 40202, subd. (e), former subd. (f), 40206.5, subd. (b), 40210, subd. (b), former § 40215, subd. (a)(1), as added or amended by Stats. 1992, ch. 1244, §§ 15, 20, 23, 26), and all steps in the collection of final and unpaid penalties, including the filing of judgments, except those matters vested in the DMV or the courts (§§ 40220, 40221, as amended by Stats. 1992, ch. 1244, §§ 27, 28). The "processing agency" was also required to file an annual "audited report," detailing, for the fiscal year, "the number of cases processed, and all sums received and distributed, together with any other information that may be specified by the issuing agency or the Controller." (§ 40200.3, subd. (b), as added by Stats. 1992, ch. 1244, § 10.2.)

The 1993 Legislature enacted a number of "cleanup amendments" to the 1992 reforms. (Assem. Bill No. 780 (1993-1994 Reg. Sess.), adopted by Stats. 1993, ch. 1093, § 1 et seq.) Among the other changes embodied in Assembly Bill No. 780 as enacted, section 40200.5(a) was amended in two respects. The authority of an issuing agency to enter a "processing" contract with "any other city or county *issuing* agency[] within the county" (italics added) was changed to allow a contract with "any other city or county *processing* agency[] within the county." (Stats. 1993, ch. 1093, § 6, italics added.) The amendment further established that the issuing agency could contract for "processing" services with such an in-county "processing agency" "other than the . . . California Highway Patrol, *the California State Police, or other state law enforcement agency . . . .*" (*Ibid.*, italics added.)

In 1994, the Legislature attempted further reforms by the passage of Assembly Bill No. 2414 (1993-1994 Reg. Sess.). Among other things, Assembly Bill No. 2414: (1) set minimum qualifications for administrative hearing examiners, (2) placed time and geographical limits on the conduct of such hearings, (3) required issuing agencies themselves, rather than "processing agenc[ies]" under contract, to investigate contested tickets and set fair hearing procedures, (4) permitted issuing agencies to contract for hearing services but provided that the hearing and processing functions must be

strictly separate, and (5) directed issuing agencies to exercise "effective oversight" of their "processing agenc[ies]." (Assem. Bill No. 2414, *supra*, §§ 5, 6, 15.5.)

As passed by the Legislature on August 31, 1994, the bill also removed the phrase "within the county" from the "contracting" provisions of section 40200.5(a). Thus, for the first time, the final version of Assembly Bill No. 2414 would clearly have authorized cities and counties that offered parking citation "processing" services to compete on an equal geographical footing with "private vendor[s]" of such services.[17] As amended by Assembly Bill No. 2414, section 40200.5(a) would have authorized an issuing agency to contract "with the county, with a private vendor, or with any other city or county processing agency, [*or*] *public or private institution of postsecondary education*, other than the . . . California Highway Patrol or the California State Police, with the consent of that other entity, for the processing of notices of parking violations and notices of delinquent parking violations *or handling of administrative appeals, or both*, prior to filing with the court . . . ." (Assem. Bill No. 2414, *supra*, § 5, italics added.)

The Governor vetoed Assembly Bill No. 2414, citing his objection to removal of the "within the county" provision from section 40200.5(a). In the Governor's view, "[p]ublic entities should not be competing with private business on a Statewide basis. Existing law appropriately allows for neighboring jurisdictions to contract with each other for the purposes of lowering costs to taxpayers. Expanding these operations Statewide, however, has quite different policy implications." The Governor reasoned that the private sector must be encouraged to offer such services and that public agencies have an "unfair[]" competitive advantage because they are "subsidized" by taxpayers and enjoy lower borrowing costs through tax-exempt bonds. Indeed, the Governor hypothesized, use of the proceeds of tax-exempt municipal securities to finance "government 'business enterprises'" is an "abuse" that might endanger the tax exemption itself under federal law. (Governor's Veto Message to Assem. on Assem. Bill No. 2414 (Sept. 30, 1994) Assem. J. (1993-1994 Reg. Sess.) interim pamp., p. 9470.)

In 1995, after the trial court denied a preliminary injunction in this case, the Legislature passed, and the Governor signed, a bill largely similar to

---

[17]When "private vendor[s]" were added in 1986 to the list of entities with which issuing agencies could contract for processing services, the placement of commas within the statute separated the category of "private vendor," on the one hand, from the category of "any other . . . agency *within the county*," on the other. (Stats. 1986, ch. 939, § 15, p. 3270, italics added.) Succeeding versions of the statute, including that currently in force, have used additional commas to set off parenthetical phrases added since 1986, thus obscuring the grammar to some degree, but without any indication of a change in the original intent. (See § 40200.5(a); see also Stats. 1993, ch. 1093, § 6; Stats. 1992, ch. 1244, § 12.)

Assembly Bill No. 2414. (Assem. Bill No. 1228 (1995-1996 Reg. Sess.), as adopted by Stats. 1995, ch. 734, § 1 et seq.) The new legislation, unlike its vetoed predecessor, retained the "within the county" phrase in section 40200.5(a). (Stats. 1995, ch. 734, § 4.)

However, the 1995 legislation included most of the other reforms attempted in 1994. It established minimum training and qualification standards for hearing examiners and set time and geographical limits on administrative hearings. (§ 40215, subds. (b), (c)(1), (c)(4)(B), as added by Stats. 1995, ch. 734, § 15.) Like Assembly Bill No. 2414, the 1995 amendments also removed certain responsibilities from the purview of a contract "processing agency." The amendments require the issuing agency itself to conduct the "initial review" (i.e., investigation and cancellation if appropriate) of a contested ticket and to set formal hearing procedures. (§ 40215, subds. (a), (c)(3), as added by Stats. 1995, ch. 734, § 15.) The 1995 modifications also provide that while issuing agencies may contract with "administrative hearing providers" for the conduct of hearings, the hearing function must be strictly separate from the "processing function," and examiners may not be employed by a "person" whose "primary duties" involve issuance, enforcement, processing, or collection. (§ 40215, subd. (c)(4)(A), as added by Stats. 1995, ch. 734, § 15.)

Like the 1994 bill, the 1995 legislation also amended section 40200.6, which deals in particular with "processing agenc[ies]." The definition of "processing agency," now contained in subdivision (a), was left untouched. However, new subdivision (b) was added to specify that, if the issuing agency contracts for processing services, "[t]he governing body of the issuing agency shall establish written policies and procedures pursuant to which the [processing agency] shall provide services." (§ 40200.6, subd. (b).) New subdivision (c) makes "[t]he issuing agency . . . responsible for all actions taken by contracting parties [i.e., either the issuing agency or the processing agency]" and requires the issuing agency to "exercise effective oversight over the parties." (*Id.*, subd. (c).) Under new subdivision (c), " '[e]ffective oversight' includes, at a minimum, an annual review of the services of the processing agency and a review of complaints made by motorists using the services of the processing agency. The issuing agency shall establish procedures to investigate and resolve complaints by motorists about any processing agency." (§ 40200.6, subd. (c), as added by Stats. 1995, ch. 734, § 5.)

Thus, while the Legislature has never expressly defined "processing," or disclosed the purpose of the long-standing provision authorizing "processing" contracts between agencies "within the [same] county," more general

clues from the language, history, and context of the pertinent statutes guide our analysis of the question. These persuade us that the limited forms of assistance Inglewood seeks to offer to issuing agencies outside Los Angeles County, insofar as they are disclosed by this preliminary record, do not violate the "within the county" provision of section 40200.5(a).

First, as we have seen, parking tickets historically were administered, at all stages after issuance and continuing through judicial resolution, by municipal and justice courts in the same counties where they were issued. Among other things, this allowed cited motorists to make payments, inquiries, and protests within the communities where the citations had been issued. However, jurisdictional and fiscal disputes arose nearly two decades ago when some local courts declined further responsibility for precomplaint ticket processing. A functional vacuum arose, in which no government entity was clearly responsible for the administration of parking tickets prior to the commencement of court actions, and the justification for allowing counties a share of local ticket revenues was undermined. Responsive legislation, adopted in 1980, thus authorized issuing agencies themselves to assume precomplaint processing functions and to retain the revenues thereby collected.

In this context, one far removed from the issues before us, the 1980 legislation included an incidental provision that if an issuing agency did not wish to "process[]" its own tickets, it could contract with another public agency "within the county" to provide such services. As far as the available record discloses, the quoted phrase prompted no debate or examination of any kind. Nothing indicates the Legislature considered the ways in which advancing technology might permit a local agency responsible for "processing" its own tickets to receive electronic or other assistance from a remote location. Indeed, there seems only a desire to disturb the traditional system as little as possible, perhaps coupled with an assumption that the substantive responsibility for essential steps in the disposition of a parking ticket should remain in the local community in order to assure convenient, fair, efficient, and accountable service to cited motorists.

Subsequent developments do not detract from this inference. Through periodic amendments, the statutory scheme has retained its essential approach to ticket "processing" agreements. By its terms, the Vehicle Code addresses only a particular form of agreement, that by which an issuing agency contracts to make another entity its "processing *agency*," i.e., "*the* contracting party *responsible* for *the processing* of" the issuing agency's parking citations. (§ 40200.6, subd. (a), italics added; see § 40200.5(a).) In turn, these substantive "responsib[ilities]" of a "processing agency," as

enumerated by the statutes, have historically included almost every pre-judicial activity required for the administration and disposition of parking tickets, including functions, such as the physical receipt of fines and penalties, the handling of motorist inquiries, and the investigation and resolution of contested citations, that a motorist would most expect to be performed near where his or her citation was issued. (See, *ante*, pp. 190-197.)

Thus, the statutory scheme contemplates that a single, identifiable "processing agency" shall be engaged in "the processing" of each issuing agency's parking tickets, and sets forth certain requirements when the issuing agency contracts to transfer *this comprehensive package of responsibilities* from itself to another entity. It follows that the phrase "within the county," as used in section 40200.5(a), also applies only to contracts *of this comprehensive kind,* and simply seeks to ensure that when the "the processing" of parking tickets is transferred by contract to a public "processing agency" other than the issuing agency, those functions shall remain in the same county. So construed, the Vehicle Code provisions, including the "within the county" language of section 40200.5(a), have no application to agreements for limited service assistance to issuing agencies which themselves retain essential "processing" responsibilities and thus remain their own "processing agenc[ies]."

Though negated in part by a gubernatorial veto (see discussion, *ante*), the Legislature's most recent attempts to reform the ticket processing scheme are, if anything, a further indication of the specific and limited nature of the geographical concerns expressed in section 40200.5(a). In particular, the 1994 Legislature adopted reforms which (1) transferred certain due process related functions (particularly, the investigation and resolution of contested tickets) from the "processing agency" to the issuing agency itself, or to a separate contract provider; (2) placed geographic limitations on the location of administrative hearings; (3) tightened the issuing agency's oversight responsibility for the quality of service still provided directly to motorists by the "processing agency"; but (4) deleted the phrase "within the county" from section 40200.5(a). (Assem. Bill No. 2414, *supra*, §§ 5, 6, *ante*, pp. 194-195.) In so doing, the Legislature indicated its belief that its reforms obviated any need for geographic limits on the location of the "processing agency" itself.

Given this background, it would defy logic, practicality, and common sense to read section 40200.5(a) as prohibiting any and all forms of direct intercounty citation management assistance among public agencies. With modern technology, there is no arbitrary county boundary on the ability of one public agency to provide cheap, efficient, uniform, and consistent

support services to another in the latter's "processing" of its own parking citations, all to the benefit of both the taxpayers and the cited motorists. Insofar as such intercounty arrangements are confined to the provision of limited support services, and do not transfer "the processing" of citations from the issuing agency to the service provider, thus making the latter the "processing agency" for such citations, we cannot conclude that the statutory scheme precludes them.

Lockheed IMS urges, however, that the "within the county" language of section 40200.5(a) has a broader purpose and scope. Lockheed IMS reiterates its view, adopted by the Court of Appeal, that this provision seeks to prevent public agencies from unfairly competing, outside their own counties, with private vendors for the provision of citation management services. Accordingly, Lockheed IMS implies, the phrase "within the county" must be construed to govern all forms of such business for which public and private vendors compete.

However, there is no indication that the statutory authority for ticket "processing" contracts between public agencies "within the [same] county" was intended to regulate competition between public and private purveyors of citation management services. As discussed above, the legislative history of Assembly Bill No. 2392, by which this provision was added in 1980, indicates no such focus. *Indeed, the statutory scheme did not even include similar authority to contract with "private vendor[s]" until six years later.* Thus, there is no logical basis to infer that the "within the county" provision was inserted to protect such private vendors from "unfair" statewide competition by public agencies.

Moreover, contrary to the position taken by Lockheed IMS and the Court of Appeal, the Governor's message explaining his 1994 veto of Assembly Bill No. 2414 is not persuasive legislative history on the issue. Courts have sometimes considered public statements by the Governor as pertinent to the meaning of *contemporaneous* legislation (e.g., *Freedom Newspapers, Inc.* v. *Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 832-833 [25 Cal.Rptr.2d 148, 863 P.2d 218]; *People* v. *Tanner* (1979) 24 Cal.3d 514, 520-521 [156 Cal.Rptr. 450, 596 P.2d 328]), but the Governor's *1994* veto message, stating his reasons why a provision *added in 1980* should not be altered, cannot supply post hoc evidence of the Legislature's intent when that provision was originally adopted.[18]

Finally, Lockheed IMS suggests that to the extent Inglewood's disclaimers of full "processing agency" responsibility are true, Inglewood's contracts for

---

[18]As noted above (see fn. 17, *ante*), when the Legislature added "private vendor[s]" to the statutory list of eligible management assistance contractors in 1986, it chose a form of language that apparently excludes such vendors from the "within the county" provision

processing services are invalid for that very reason. In other words, Lockheed IMS hypothesizes, section 40200.5(a) *only* authorizes contracts by which one agency becomes the full "processing agency" for another agency "within the [same] county." *All other* contracts between public agencies for assistance in citation management, Lockheed IMS reasons, must therefore be forbidden.

However, as we have indicated, other statutory sources confirm the general authority of local agencies such as Inglewood and its customers to contract with each other for "[m]unicipal services or functions," including assistance in the administration of parking citations. (Gov. Code, § 54981; see discussion *ante*, pp. 182-185.) We have further concluded that if section 40200.5(a) contains any implied *restrictions* on citation management assistance contracts between public agencies, these restrictions are aimed only at contracts which make one agency the "processing agency" for an issuing agency located in another county. We read nothing in section 40200.5(a), or in other pertinent aspects of the statutory scheme, which implies a prohibition on interagency contracts involving mere support services to an issuing agency which remains its own "processing agency."[19]

Applying the principles we have discussed to the limited preliminary record before us, we find nothing therein to indicate that Inglewood threatens to violate section 40200.5(a) by contracting to become the "processing agency" for its customers outside Los Angeles County, with responsibility for "the processing" of their tickets. So far as appears, Inglewood seeks to offer such agencies no more than a limited form of service, whose primary feature is the automatic performance by Inglewood's computer of various

---

applicable to public agencies. Though the issue was never debated, one might argue that this choice of language indicates an affirmative legislative intent to distinguish between the two classes of vendors, and to impose a geographical disadvantage on public purveyors of citation management assistance services who seek to compete against the private sector. Any such inference, however, is largely undermined by the Legislature's 1994 decision to *remove* the "within the county" limitation entirely. That amendments enacted in 1995 retained this language has no strong bearing on the issue; it seems obvious that the Legislature's decision in that regard was but a concession to the Governor's 1994 veto, which had arisen specifically from the Legislature's attempt to delete the provision.

[19]Indeed, by advancing this argument, Lockheed IMS hoists itself on its own petard. If section 40200.5(a) forbids parking citation management assistance contracts other than those in which the service provider becomes a full statutory "processing agency" for the service recipient, that restriction applies equally to public and private vendors. Since Lockheed IMS has represented that it offers services "similar" to Inglewood's, section 40200.5(a) would therefore invalidate Lockheed IMS's service contracts to the same degree as it does Inglewood's.

routine reporting, recording, routing, and scheduling transactions, in response to electronic signals from the issuing agencies themselves.[20]

Inglewood's proposed services appear to include virtually no discretion or independent judgment with respect to its customers' tickets. Nor might the functions Inglewood offers to assume affect the quality of service to persons who have been cited for parking violations. Inglewood seeks no direct responsibility for relations with motorists who have been cited for parking violations by the issuing agencies. Indeed, there is no reason for cited motorists even to know of Inglewood's relationship to the issuing agency, and the geographic location of an agency performing the computerized services Inglewood offers is a matter of practical indifference to them. Hence, the contracts contemplated by Inglewood do not create any problems of consistency, fairness, or convenience which might inhere if a public "processing agency" located in one county were engaged in "the processing" of parking tickets issued in another.[21]

We therefore conclude that the preliminary injunction proceedings disclose no threatened violation of the Vehicle Code provisions at issue in this

---

[20]Under the arrangement Inglewood recommends to potential out-of-county customers, the only significant nonelectronic service Inglewood offers is an option for Inglewood's employees to physically mail notices, such as delinquency and administrative hearing notices, which have been generated by the computer. The mailing option simply permits customer agencies to obtain the benefit of volume bulk mailing rates available to Inglewood, and we do not deem Inglewood's provision of this service to constitute "the processing" of tickets by a "processing agency."

At oral argument, counsel for Lockheed IMS asserted that Inglewood can, and will on request, accept physical payments of fines and penalties on behalf of customer agencies. Certain ambiguous language in Inglewood's PSA, issued in response to San Diego's RFP, can be construed to indicate that Inglewood is able to provide such services, or to arrange for their provision by a third party. (See PSA §§ 5.1, par. 1, 9.3.2(2), 9.3.2.(4).) However, the PSA recommends against such procedures, suggesting that the issuing agency itself can better provide such services for itself and should do so. (*Id.*, §§ 9.3.2.(2), 9.3.2.(4).) Inglewood official Nyman testified to similar effect. On the assumption that Inglewood is thus not threatening to provide services of this kind to agencies outside Los Angeles County, we need not and do not address how their provision by Inglewood might influence a determination whether Inglewood is a "processing agency" engaged in "the processing" of parking tickets from other counties.

[21]The 1995 amendments underscore the Legislature's primary concern with the quality of services furnished by a contract provider who has assumed the full statutory responsibilities of a "processing agency," particularly including those services received directly by the recipients of citations. Under these recent revisions, as noted above, the issuing agency must exercise "effective oversight" of the services provided under contract by a "processing agency" (i.e., "*the* contracting party responsible for *the processing*" of the issuing agency's tickets (italics added)). At a minimum, this oversight must include the establishment of "written policies and procedures" for such service and an "annual review" of service focused largely on the review, investigation, and resolution of "complaints . . . by motorists" about their treatment at the hands of the "processing agency." (§ 40200.6, subd. (b), as added by Stats. 1995, ch. 734, § 5.) But as we have indicated, Inglewood takes no contractual

case. The Court of Appeal erred in holding otherwise, based on its belief that section 40200.5(a) prohibits a public agency in one county from providing *any assistance whatever* toward the management, administration, or disposition of parking citations issued by a public agency in another county. On the basis of this error, the Court of Appeal directed, pending a trial on the merits, that Inglewood be barred from "accepting or executing any future contracts to process notices of parking violations for issuing agencies located outside Los Angeles County." As defined by the Court of Appeal, the word "process" used in its order clearly includes even those limited services which we have concluded on this record Inglewood may properly provide to customers in other counties. Accordingly, we will reverse the judgment of the Court of Appeal.[22]

We caution again that our holding is narrowly based on the preliminary record here subject to review. We cannot and do not decide what final judgment might be appropriate should a full trial on the merits develop facts substantially at odds with the principles discussed in this opinion.

DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Blease, J.,* concurred.

---

responsibility for direct service to motorists cited outside Los Angeles County; that function is entirely retained by the issuing agencies themselves.

[22]Our conclusion that, on the available record, the terms of section 40200.5(a) do not prohibit the contract services Inglewood proposes to offer outside Los Angeles County makes it unnecessary to address an additional issue decided by the Court of Appeal and included within our original review order, i.e., whether Inglewood's status as a charter city allows it to enter the disputed contracts, as an exercise of its home rule powers over its municipal affairs, regardless of any prohibition set forth in section 40200.5(a). (See Cal. Const., art. XI, § 5, subd. (a).)

*Associate Justice of the Court of Appeal, Third District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.