[No. S175855. Nov. 8, 2010.]

Conservatorship of the Person and Estate of ROY WHITLEY.
NORTH BAY REGIONAL CENTER, Petitioner and Respondent, v.
VIRGINIA MALDONADO, Objector and Appellant.

## COUNSEL

Severson & Werson, Jan T. Chilton and Donald J. Querio for Objector and Appellant.

Farella Braun & Martel, Mark D. Petersen and Patrick McKinney for California Association of State Hospitals/Parent Councils for the Retarded and California Association for the Retarded as Amici Curiae on behalf of Objector and Appellant.

Shute, Mihaly & Weinberger, Ellison Folk and Brianna R. Fairbanks for Sierra Club, Planning and Conservation League, Baykeeper, Greenbelt Alliance and Hills for Everyone as Amici Curiae on behalf of Objector and Appellant.

Richard A. Rothschild and Lisa Jaskol for Los Angeles County Bar Association, Beverly Hills Bar Association, Western Center on Law and Poverty and Public Counsel as Amici Curiae on behalf of Objector and Appellant.

Alan L. Schlosser; Peter Eliasberg; and David Blair-Loy for ACLU of Northern California, ACLU of Southern California and ACLU of San Diego and Imperial Counties as Amici Curiae on behalf of Objector and Appellant.

Randolph Cregger & Chalfant, Miller Law Group and Joseph P. Mascovich for Petitioner and Respondent.

Jennifer B. Henning for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Petitioner and Respondent.

Meriem L. Hubbard for Pacific Legal Foundation as Amicus Curiae.

## OPINION

**MORENO, J.**—Under Code of Civil Procedure section 1021.5, a litigant who acts as a private attorney general and is a successful party in the

litigation may under certain circumstances recover attorney fees from the opposing parties. One of the requirements that courts are directed to consider when determining eligibility for attorney fees is "the necessity and financial burden of private enforcement." As explained below, courts have long construed this language to mean, among other things, that a litigant who has a financial interest in the litigation may be disqualified from obtaining such fees when expected or realized financial gains offset litigation costs. What is less clear is whether nonfinancial, nonpecuniary personal interests in the litigation, such as vindicating the best interests of a child or sibling, can also serve to render a litigant ineligible for attorney fees, as some Courts of Appeal have held. That issue is squarely presented by this case.

We conclude that a litigant's personal nonpecuniary motives may not be used to disqualify that litigant from obtaining fees under Code of Civil Procedure section 1021.5. The contrary interpretation, which was adopted by the Court of Appeal in this case, has no basis in the language, legislative history, or evident purpose of section 1021.5. As discussed below, the purpose of section 1021.5 is not to compensate with attorney fees only those litigants who have altruistic or lofty motives, but rather all litigants and attorneys who step forward to engage in public interest litigation when there are insufficient financial incentives to justify the litigation in economic terms. Accordingly, we reverse the Court of Appeal's judgment and remand for proceedings consistent with this opinion.

## I. STATEMENT OF FACTS

Most of the facts, taken largely from the Court of Appeal opinion, are not in dispute. Virginia Maldonado has served for over 25 years as conservator for her brother, Roy Whitley, who is a developmentally disabled adult with epilepsy, mild cerebral palsy, and profound mental retardation. In *Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447 [66 Cal.Rptr.3d 808] (*Whitley I*), the Court of Appeal considered Maldonado's challenge to a trial court order, entered over her objection, granting the North Bay Regional Center's request to move Whitley from the Sonoma Developmental Center, where he had lived for over 40 years, to Miracle Lane, a smaller, community-based facility. The trial court's decision to approve Whitley's move to Miracle Lane came after a two-day evidentiary hearing in the superior court, as contemplated in the settlement of an unrelated federal case (see *Richard S. v. Dept. of Developmental Services* (C.D.Cal., Mar. 27, 2000, No. SA CV 97-219-GLT(ANx)) 2000 U.S.Dist. Lexis 22750 (*Richard S.*), revd. on other grounds in *Cable v. Dept. of Developmental Services* (9th Cir. Dec. 17, 2002, No. 01-56723) 2002 U.S. App. Lexis 26316). (*Whitley I*, at p. 1456.)

The *Richard S.* settlement dictated procedures to be followed when a member of the developmentally disabled person's interdisciplinary team objects to a community placement decision. As *Whitley I* explains, "[b]y the terms of the settlement, whenever a recommendation is made that a developmental center resident is to be moved to a community living arrangement and a placement has been located, [the State Department of Developmental Services] sends a written notice of the intent to transfer to the superior court having jurisdiction over the resident. If any team member disagrees with the plans to move the resident into the community, the notice includes a statement to that effect along with a 'Request for Hearing' form if the objector wishes to be heard on the issue of placement. [¶] . . . [I]t is up to the court to determine whether or not it will hold a hearing. If the court takes no action on the request, the settlement agreement provides that the transfer to the community living arrangement proceeds as scheduled. If a hearing is scheduled, the transfer is not made until after the court's ruling." (*Whitley I, supra*, 155 Cal.App.4th at p. 1459.)

The Court of Appeal reversed and remanded, finding that the superior court lacked jurisdiction to conduct the *Richard S.* hearing on the propriety of Whitley's community placement. (*Whitley I, supra*, 155 Cal.App.4th at p. 1464.) The Court of Appeal concluded the only means by which Maldonado's objection to the North Bay Regional Center's community placement decision could be resolved was by invoking the statutorily authorized administrative fair hearing provisions provided under the Lanterman Developmental Disabilities Services Act (Lanterman Act) (Welf. & Inst. Code, § 4500 et seq.). (*Whitley I, supra*, at pp. 1462–1463.) "In contrast to the discretionary judicial procedure forged in the *Richard S.* litigation, the Lanterman Act guarantees an applicant for or recipient of services or his or her representative 'who is dissatisfied with any decision or action of the service agency' the right to an administrative fair hearing. (Welf. & Inst. Code, § 4710.5, subd. (a).) The statute also provides detailed provisions for claimants who wish to attempt to resolve the issue through a voluntary informal meeting or through voluntary mediation before proceeding to an administrative fair hearing." (*Whitley I, supra*, 155 Cal.App.4th at pp. 1459–1460.) The court cited two reasons to support its conclusion that the Lanterman Act procedures rather than the *Richard S.* procedures govern. First, Maldonado was not a party to the *Richard S.* settlement, so it was not binding on her. (*Whitley I, supra*, at pp. 1461–1462.) Second, the Lanterman Act's comprehensive approach to resolving disagreements concerning placement decisions— including a voluntary meeting, voluntary mediation, and an administrative fair hearing with judicial review—showed the Legislature's intent that the Lanterman Act's fair hearing procedures be the exclusive remedy for actions by legal representatives, such as Maldonado, asserting an objection to a community placement decision. (*Whitley, supra*, at pp. 1462–1463.)

After *Whitley I* was issued, Maldonado moved for an award of $177,887 in attorney fees under Code of Civil Procedure section 1021.5.[1] An award was warranted, according to Maldonado, because *"Whitley* created a procedural precedent that . . . conferred a significant benefit on the public and a large class of persons." Additionally, "Maldonado's victory on appeal transcended her personal interest in Whitley's welfare."

The North Bay Regional Center did not dispute the reasonableness of the hours Maldonado's appellate counsel devoted to this case or the rates charged. Nor did it dispute that a fee award is permissible even though her appellate counsel agreed to handle the case on a pro bono basis. However, it opposed Maldonado's request for attorney fees on the ground that this case does not meet all the criteria for an award of fees under section 1021.5, arguing that even if an important public right was at issue, a significant benefit was not conferred upon the public or a large class of persons, and the financial burden imposed on Maldonado was not out of proportion to her personal interest in blocking her brother's transfer. The trial court agreed with both of these arguments and denied the attorney fee request.

Maldonado appealed, contending among other things that section 1021.5's requirement that fees be awarded only when the "necessity and financial burden of private enforcement . . . make the award appropriate" means that litigants may not be eligible for attorney fees when they have an individual *pecuniary* stake in the litigation, but that litigants may not be disqualified simply because they have a personal, nonpecuniary interest. Because Maldonado did not have a pecuniary interest in the litigation, but only an interest related to her brother's welfare, she argued that she met the "necessity and financial burden" requirement. The Court of Appeal disagreed, holding, in accordance with a number of Court of Appeal cases discussed below, that a strong nonpecuniary personal interest in the litigation, such as Maldonado's in the present case, could disqualify a litigant from obtaining attorney fees under section 1021.5. We granted review to address this issue.

## II. DISCUSSION

We initially consider the proper standard of review. " 'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law.' " (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175 [39 Cal.Rptr.3d 788, 129 P.3d 1].) Here, we granted review to

---

[1] All statutory references are to this code unless otherwise indicated.

address a particular issue of law that requires us to construe a statute: specifically, whether a litigant's nonpecuniary interests can disqualify him or her from eligibility for attorney fees under section 1021.5. We review this question of law de novo.

■ In matters of statutory construction, "[w]e apply well-established principles of statutory construction in seeking 'to determine the Legislature's intent in enacting the statute " 'so that we may adopt the construction that best effectuates the purpose of the law.' " ' [Citations.] We begin with the statutory language because it is generally the most reliable indication of legislative intent. [Citation.] If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citation.]" (*Shirk v. Vista Unified School Dist.* (2007) 42 Cal.4th 201, 211 [64 Cal.Rptr.3d 210, 164 P.3d 630].) But if the statutory language may reasonably be given more than one interpretation, courts may employ various extrinsic aids, including a consideration of the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. (*Ibid.*)

■ We begin by examining the language of the statute. As we summarized shortly after the statute was enacted, eligibility for section 1021.5 attorney fees is established when "(1) plaintiffs' action 'has resulted in the enforcement of an important right affecting the public interest,' (2) 'a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons' and (3) 'the necessity and financial burden of private enforcement are such as to make the award appropriate.' " (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 935 [154 Cal.Rptr. 503, 593 P.2d 200] (*Woodland Hills*).)[2] This case focuses on the third requirement.

■ As has been observed, the necessity and financial burden requirement " 'really examines two issues: whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys.' " (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1348 [39 Cal.Rptr.3d 550] (*Lyons*), quoting Pearl, Cal.

---

[2] Section 1021.5 provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

Attorney Fee Awards (Cont.Ed.Bar 2d ed. 2004) § 4.31, p. 117.) The "necessity" of private enforcement " ' " 'looks to the adequacy of public enforcement and seeks economic equalization of representation in cases where private enforcement is necessary.' " [Citations.]' " (*Lyons, supra,* 136 Cal.App.4th at p. 1348.) Thus in *Woodland Hills,* in which a citizens' group challenged a city's approval of a subdivision map as unlawful, the court stated that "[i]nasmuch as the present action proceeded against the only governmental agencies that bear responsibility for the subdivision approval process, the necessity of private, as compared to public, enforcement becomes clear." (*Woodland Hills, supra,* 23 Cal.3d at p. 941.) On the other hand, the award of attorney fees is not appropriate when the public rights in question were adequately vindicated by governmental action. (See, e.g., *Ciani v. San Diego Trust & Savings Bank* (1994) 25 Cal.App.4th 563, 573 [30 Cal.Rptr.2d 581].)

The second prong of the inquiry addresses the "financial burden of private enforcement." In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. " 'An award on the "private attorney general" theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter." [Citation.]' " (*Woodland Hills, supra,* 23 Cal.3d at p. 941.) "This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit." (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 321 [193 Cal.Rptr. 900, 667 P.2d 704] (*Press*).)

The method for weighing costs and benefits is illustrated in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 [232 Cal.Rptr. 697] (*Los Angeles Police Protective League*). "The trial court must first fix—or at least estimate—the monetary value of the benefits obtained by the successful litigants themselves. . . . Once the court is able to put some kind of number on the gains actually attained it must discount these total benefits by some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome. . . . Thus, if success would yield . . . the litigant group . . . an aggregate of $10,000 but there is only a one-third chance of ultimate victory they won't proceed—as a rational matter—unless their litigation costs are substantially less than $3,000.

"After approximating the estimated value of the case at the time the vital litigation decisions were being made, the court must then turn to the costs of the litigation—the legal fees, deposition costs, expert witness fees, etc., which

may have been required to bring the case to fruition. . . . [¶] The final step is to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case. . . . [A] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs." (*Los Angeles Police Protective League, supra,* 188 Cal.App.3d at pp. 9–10.)

█ Thus in *Press,* a case in which parties that enforced a right to gather signatures for a statewide oil profits initiative petition in front of a supermarket sought attorney fees, the court rejected the notion that the plaintiffs' personal interest in the outcome of the initiative rendered them ineligible for such fees: "That plaintiffs' personal interests in the outcome of the oil profits initiative were sufficient to induce them to bring this action is irrelevant. As the statute makes clear, subdivision (b) of section 1021.5 focuses not on plaintiffs' abstract personal stake, but on *the financial incentives and burdens* related to bringing suit. Indeed, in the absence of some concrete personal interest in the issue being litigated, the putative plaintiff would lack standing to bring an action." (*Press, supra,* 34 Cal.3d at p. 321, fn. 11, italics added.)

*Press*'s focus on financial incentives and burdens has been followed in a number of cases. The Court of Appeal in *Phipps v. Saddleback Valley Unified School Dist.* (1988) 204 Cal.App.3d 1110 [251 Cal.Rptr. 720] (*Phipps*) upheld an award of attorney fees for obtaining injunctive relief compelling a school district to reverse its policy of denying classroom access to a student testing positive for AIDS. The court quoted approvingly the trial court's statement that " '[s]ince [Phipps] had no pecuniary interest in the outcome of the litigation, "the financial burden in this case [was] such that an attorney fee award [was] appropriate in order to assure the effectuation of an important public policy." ' " (*Id.* at p. 1122; accord, *Plumbers & Steamfitters, Local 290 v. Duncan* (2007) 157 Cal.App.4th 1083, 1099 [69 Cal.Rptr.3d 184] [approving attorney fees award for union enforcing prevailing wage law when litigation costs substantially exceeded financial benefits]; *Luck v. Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 30 [267 Cal.Rptr. 618] [no attorney fees in case involving invasion of privacy rights through random drug testing where plaintiff sought a substantial monetary damages award]; *California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 751 [246 Cal.Rptr. 285] ["The fact a plaintiff has little or no personal financial interest in the outcome of the litigation and is not vindicating a private economic interest tends to show [the financial burden] requirement has been met."]; *Slayton v. Pomona Unified School Dist.* (1984) 161 Cal.App.3d 538, 552–553 [207 Cal.Rptr. 705] [attorney fees awarded in case in which a group of students were wrongfully disciplined, when they had no pecuniary interest at stake].)

■ The literal language of section 1021.5 supports the *Press* court's focus on *financial* incentives and burdens. The statute requires a court to consider the "financial burden of private enforcement." As a logical matter, a strong nonfinancial motivation does not change or alleviate the "financial burden" that a litigant bears. Only offsetting pecuniary gains can do that. The North Bay Regional Center contends that the language of section 1021.5 supports its view that nonpecuniary interests may disqualify a litigant from eligibility for attorney fees, echoing the argument made by the court in *Hammond v. Agran* (2002) 99 Cal.App.4th 115 [120 Cal.Rptr.2d 646] (*Hammond*): "Nothing in the text confines the consideration of the necessity and financial burden clause to just financial interests. True, the words 'financial burden' certainly imply that a court should look at what the claimant hoped to gain financially from the litigation in comparison to what it cost. But it doesn't follow that a court must stop there. The addition of the word 'necessity' suggests, lest it be redundant, that factors beyond just 'financial burden' also may be looked at." (*Id.* at p. 125.)

Yet as we have seen, the "necessity . . . of private enforcement" has long been understood to mean simply that public enforcement is not available, or not sufficiently available. (See *Lyons, supra,* 136 Cal.App.4th at p. 1348; Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 2d ed. 2008 update) § 4.32, pp. 125–128 and cases cited therein.) Indeed, the *Hammond* court's interpretation of "necessity" in this context makes little sense. What the *Hammond* court, and the North Bay Regional Center, seem to be arguing for is a statute that reads something like this: "The necessity of *private attorney general fees as an incentive to encourage* private enforcement is such as to make the award appropriate." Read this way, private attorney general fees are deemed in some cases unnecessary because the nonpecuniary motivation is determined to be sufficiently strong. But there is no justification for adding the italicized language to the statute, thereby changing *its* meaning. Strong personal motivation may increase the *likelihood* of private enforcement, but it does not, as a logical matter, affect the *necessity* of private enforcement— only the availability of public enforcement does that. Therefore, the term "necessity . . . of private enforcement" reasonably construed does not support the argument that a litigant's nonpecuniary interests affect his or her eligibility for section 1021.5 fees.

The *Press* court's focus on financial costs and burdens is also in accord with the available legislative history. As we have recounted in *Woodland Hills, supra,* 23 Cal.3d 917, "the Legislature adopted section 1021.5 as a codification of the 'private attorney general' attorney fee doctrine that had been developed in numerous prior judicial decisions. As we explained in *Serrano* [*v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303]], the fundamental objective of the private attorney general doctrine of attorney fees is ' "to encourage suits effectuating a strong [public] policy by awarding

substantial attorney's fees . . . to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens." ' (20 Cal.3d at p. 43 (quoting *D'Amico* v. *Board of Medical Examiners* [(1974)] 11 Cal.3d 1, 27 [112 Cal.Rptr. 786, 520 P.2d 10]).) The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will *as a practical matter frequently be infeasible.*" (*Woodland Hills, supra,* 23 Cal.3d at p. 933, some italics added.)

This emphasis on remediating the infeasibility of public interest litigation is underscored in various legislative history documents. As was stated by the Department of Consumer Affairs in its enrolled bill report to the Governor on Assembly Bill No. 1310 (1977–1978 Reg. Sess.), the bill that was to become section 1021.5: "Traditionally, parties to a civil action must pay for their own attorneys fees, either directly from their own personal resources, or by contingency fee out of any recovery that may be awarded in the case. However, the cases covered by AB 1310 often result in nonpecuniary or intangible recoveries, thus precluding the possibility of a contingency fee arrangement. In addition, such cases require extensive amounts of attorney time and skill since the issues being decided are often of first impression in the courts and are without established legal precedents. Thus, these cases are prohibitively expensive for almost all citizens. Yet, such cases can have important consequences for large numbers of the public." (Dept. of Consumer Affairs, Enrolled Bill Rep. on Assem. Bill No. 1310 (1977–1978 Reg. Sess.) prepared for Gov. Brown (Sept. 28, 1977) p. 2.)[3]

---

[3] In *Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, footnote 19 [22 Cal.Rptr.3d 530, 102 P.3d 915], we rejected the argument that enrolled bill reports are irrelevant to discerning legislative intent because they are prepared after the Legislature's passage of the bill. As we stated: "[W]e have routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent. (See, e.g., *Lolley v. Campbell* (2002) 28 Cal.4th 367, 375–376 [121 Cal.Rptr.2d 571, 48 P.3d 1128] [Department of Industrial Relations enrolled bill report]; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1399 [241 Cal.Rptr. 67, 743 P.2d 1323] [same]; *Yamaha Corp. v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 22–23 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *Lockheed Information Management Services Co. v. City of Inglewood* (1998) 17 Cal.4th 170, 184 [70 Cal.Rptr.2d 152, 948 P.2d 943].) Though we do not give great weight to the report, it is instructive here." (*Ibid.*) Reliance on enrolled bill reports has been criticized by some Courts of Appeal. (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 40–41 [34 Cal.Rptr.3d 520] and cases cited therein.) But it is well established that "[t]he contemporaneous construction of a new enactment by the administrative agency charged with its enforcement, although not controlling, is entitled to great weight." (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1388.) An implicit reason for the rule is that a contemporaneous construction is likely to reflect the understanding of the Legislature that enacted the statute, which will not be the case with an administrative

The theme of the financial feasibility of public interest litigation is further underscored by the testimony of John R. Phillips, an executive committee member of the State Bar legal services section, before the Senate Judiciary Committee considering Assembly Bill No. 1310 (1977–1978 Reg. Sess.): "[I]t is extremely difficult to entice private lawyers and law firms, even the most public spirited, to devote substantial time and money to vindicate public rights when it means that they will have no chance whatsoever to recoup their fees and costs. If these attorneys and law firms felt there was a possibility of getting fees on those successfully litigated cases which confer a substantial benefit on a broad segment of the public, we would be far more successful in getting attorneys to engage in public interest litigation. . . . [¶] [S]ubstantial benefits to the general public should not depend upon the financial status of the plaintiff or upon the charity of foundations or upon the charity of public-minded lawyers alone. Where the benefit is conferred upon a large number of persons, it is inequitable that a person who steps forward to enforce the rights should bear the entire cost. AB 1310 will rectify the situation by authorizing a court, in its discretion, to grant attorneys' fees to the successful party under these particular circumstances. The legal system will become a more egalitarian instrument by encouraging attorneys to act as citizen attorneys general and to use the courtrooms to broaden the concept of democracy." (Testimony of John R. Phillips to Sen. Judiciary Com., Aug. 16, 1977, in support of Assem. Bill No. 1310 (1977–1978 Reg. Sess.) pp. 7–8 (Phillips testimony).)

It is noteworthy that the above legislative history does not focus on litigants' initial subjective motivation—on what may cause them to want to bring a public interest lawsuit. What section 1021.5 does address is the problem of affordability of such lawsuits. Because public interest litigation often yields nonpecuniary and intangible or widely diffused benefits, and because such litigation is often complex and therefore expensive, litigants will be unable either to afford to pay an attorney hourly fees or to entice an attorney to accept the case with the prospect of contingency fees, thereby often making public interest litigation "as a practical matter . . . infeasible." (*Woodland Hills, supra*, 23 Cal.3d at p. 933.) Accordingly, public interest litigation prior to section 1021.5 depended on subsidies either from well-heeled litigants and their supporters, or from the pro bono work of attorneys.

construction made many years after the fact. (See *id.* at p. 1389.) So, too, is an enrolled bill report, generally prepared within days after the bill's passage, likely to reflect such legislative understanding, particularly because it is written by a governmental department charged with informing the Governor about the bill so that he can decide whether to sign it, thereby completing the legislative process. Although these reports certainly do not take precedence over more direct windows into legislative intent such as committee analyses, and cannot be used to alter the substance of legislation, they may be as here "instructive" in filling out the picture of the Legislature's purpose.

(Phillips testimony, *supra*, at pp. 7–8.) Section 1021.5 addresses this affordability problem with the inducement of attorney fees for public interest litigation when certain conditions in the statute are met. Stated another way, the Legislature that enacted section 1021.5 was not so much concerned with what brought a litigant with a potential public interest case into an attorney's office, but rather with allowing that litigation to move forward from there by offering at least the prospect that the financial burden of the litigation could be shifted to the opposing party if the litigant prevailed.

■ Amici curiae California State Association of Counties and League of California Cities point to a number of cases emphasizing that the litigant's motivation is critical to determining eligibility for fees under section 1021.5. "If the enforcement of the public interest is merely 'coincidental to the attainment of . . . personal goals' [citation] . . . then [the necessity and financial burden] requirement is not met." (*California Common Cause v. Duffy, supra,* 200 Cal.App.3d at pp. 750–751.) "Section 1021.5 is intended as a 'bounty' for pursuing public interest litigation, not a reward for litigants motivated by their own interests who coincidentally serve the public." (*California Licensed Foresters Assn. v. State Bd. of Forestry* (1994) 30 Cal.App.4th 562, 570 [35 Cal.Rptr.2d 396].) Yet although broad terms such as "personal goals" and "own interests" are used, it is clear that, with the exception of the handful of cases discussed below, the case law has focused on the litigant's *financial* interests. (*California Common Cause v. Duffy, supra,* at pp. 750–751; *California Licensed Foresters Assn. v. State Bd. of Forestry, supra,* at pp. 570–572; see also *City of Los Angeles v. 2000 Jeep Cherokee* (2008) 159 Cal.App.4th 1272, 1281 [72 Cal.Rptr.3d 252]; *Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1046–1047 [114 Cal.Rptr.2d 787]; *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1305 [255 Cal.Rptr. 704]; *Schmid v. Lovette* (1984) 154 Cal.App.3d 466, 479 [201 Cal.Rptr. 424].)

■ The use of language concerning motivation in the case law is understandable. As the Court of Appeal aptly observed in *Satrap v. Pacific Gas & Electric Co.* (1996) 42 Cal.App.4th 72, 77 [49 Cal.Rptr.2d 348], although "subjective motivation for bringing the lawsuit is not a controlling factor in determining whether a Code of Civil Procedure section 1021.5 fee award is appropriate," a court may speak of the litigant's motivation "as a shorthand reference to the court's conclusion that the objective financial incentives for prosecuting the lawsuit were not disproportionate to the financial burden." Motivation language is particularly useful because in assessing the financial burdens and benefits in the context of section 1021.5, we are evaluating incentives rather than outcomes. " '[W]e do not look at the plaintiff's *actual* recovery after trial, but instead we consider "the estimated value of the case at the time the vital litigation decisions were being made." ' [Citation.] The reason for the focus on the plaintiff's expected recovery at the time litigation

decisions are being made, is that Code of Civil Procedure section 1021.5 is intended to provide an incentive for private plaintiffs to bring public interest suits when their personal stake in the outcome is insufficient to warrant incurring the costs of litigation." (*Satrap, supra,* at p. 79.) Although objective financial incentives and subjective motives may overlap, and indeed sometimes may be indistinguishable, it is clear from the language and purpose of the statute that only the former is the proper subject of the court's inquiry when assessing the financial burden of litigation under section 1021.5.

The North Bay Regional Center relies principally on four Court of Appeal cases that have concluded that nonpecuniary interests can render a litigant ineligible for section 1021.5 fees. In *Williams v. San Francisco Bd. of Permit Appeals* (1999) 74 Cal.App.4th 961 [88 Cal.Rptr.2d 565] (*Williams*), the petitioner was the owner and resident of a Victorian-style house in San Francisco in a neighborhood of similar such houses, who sought section 1021.5 attorney fees after successfully opposing the construction of a four-story three-unit condominium or apartment building that would have been out of character with the neighborhood. (74 Cal.App.4th at p. 963.) The petitioner claimed that his property value would not have been affected by the construction of the apartment building. The Court of Appeal held that, even so, for reasons discussed below, his strong personal interest in maintaining the neighborhood as he saw fit precluded him from obtaining attorney fees under the "necessity and financial burden" clause of section 1021.5.

In *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505 [94 Cal.Rptr.2d 205] (*Families Unafraid*), the plaintiffs successfully opposed a large development in their area. The Court of Appeal concluded, contrary to the trial court, that the plaintiffs had only a minor financial stake in the litigation, which was out of proportion to the substantial litigation costs. (*Id.* at pp. 518–520.) Nonetheless, the court, relying in large part on *Williams*, remanded the matter to the superior court on the attorney fees issue to determine whether nonpecuniary interests, such as aesthetic interests, would preclude or diminish an attorney fee award. (*Id.* at p. 520.)

In *Hammond, supra,* 99 Cal.App.4th 115, city council candidate Agran defended a challenge from a political rival contending that his candidate statement appearing in the ballot pamphlet contained impermissible matters under the governing statute, Elections Code section 13307, which specified that candidate statements in ballot pamphlets include " 'a brief description, of no more than 200 words, of the candidate's education and qualifications . . . .' " (*Hammond*, at p. 119.) Agran had included in the ballot statement his opposition to a proposed airport, and that statement of opposition was challenged as unlawful under the statute. The accuracy of his statement that

he had "led" the Irvine city council's effort to develop the city's general plan was also challenged. He lost in the trial court, and the portion of his candidate statement expressing opposition to the airport, as well as the challenged portion of his statement regarding city council leadership, was deleted. Agran appealed the decision and meanwhile won the city council seat. On appeal, he prevailed on the merits, and sought section 1021.5 attorney fees. The *Hammond* court, in resolving the case before it, separated the litigation of the accuracy of the statement of qualifications from the litigation of the scope of Elections Code section 13307. The court held that attorney fees for the former litigation could not be recouped, because Agran, like other politicians, had an "intense" personal interest in his reputation, even if it was not a pecuniary interest, which that part of the litigation vindicated. (*Hammond, supra,* 99 Cal.App.4th at p. 129.) On the other hand, the court held that Agran was eligible for attorney fees for that portion of the litigation directed at determining the meaning of Elections Code section 13307, which proceeded after his electoral victory had been assured and which transcended his personal interests. (*Hammond, supra,* 99 Cal.App.4th at pp. 132–133.)

Finally, in *Punsly v. Ho* (2003) 105 Cal.App.4th 102 [129 Cal.Rptr.2d 89] (*Punsly*), the Court of Appeal had held unconstitutional a lower court order mandating that a child's grandparents be given visitation rights pursuant to Family Code section 3102 over the objection of the sole surviving parent. In upholding the trial court's denial of the parent's request for Code of Civil Procedure section 1021.5 attorney fees because of the importance of the constitutional issue, the court observed that "[t]his was a fact-intensive case and resulted in a relatively narrow, as-applied ruling on the constitutional principles involved" and that the litigation was "intensely personal." (*Punsly, supra,* 105 Cal.App.4th at p. 118.) It then concluded that the necessity and financial burden requirement had not been met because the parent's personal interests although nonpecuniary were strong enough to motivate the litigation. (*Ibid.*)

Except for *Hammond*'s erroneous construction of the meaning of "necessity" discussed above, these courts did not attempt to divine the meaning of section 1021.5 from its language or legislative history. Rather, they relied on interpretive language in other judicial decisions to find justification for their view that nonpecuniary interests could preclude an attorney fees award. The *Williams* court, for example, focused on the language in *Woodland Hills* that " '[a]n award on the "private attorney general" theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter." ' " (*Woodland Hills, supra,* 23 Cal.3d at p. 941, quoting *County of Inyo v. City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 [144 Cal.Rptr. 71].) It then concluded that there

was no judicial authority for the proposition that the term "individual stake in the matter" referred solely to pecuniary interests. (*Williams, supra*, 74 Cal.App.4th at p. 967.) Yet it is clear that the *Woodland Hills* court used the term "individual stake in the matter" to mean individual pecuniary stake, as evidenced by the language in the paragraph following the statement *Williams* quotes: "[D]efendants contend that the plaintiffs' victory in the underlying suit did not 'transcend [their] personal interest' and that the litigation expenses did not place a disproportionate burden on plaintiffs. Plaintiffs directly challenge these claims, pointing out that in defense of their attorney fee motion they introduced evidence to demonstrate that their fiscal resources are minimal, *that their personal financial interest in the present action is small* and that the litigation expenses entailed in actions of this type are considerable." (*Woodland Hills, supra*, 23 Cal.3d at p. 941, italics added.) The *Woodland Hills* court remanded to the trial court for "findings on these issues." (*Ibid.*)

*Williams* and its progeny also focused on this court's statement in *Press* discussed above: "That plaintiffs' personal interests in the outcome of the oil profits initiative were sufficient to induce them to bring this action is irrelevant. As the statute makes clear, subdivision (b) of section 1021.5 focuses not on plaintiffs' *abstract* personal stake, but on the financial incentives and burdens related to bringing suit. Indeed, in the absence of some concrete personal interest in the issue being litigated, the putative plaintiff would lack standing to bring an action." (*Press, supra*, 34 Cal.3d at p. 321, fn. 11, italics added.) These courts have seized upon the juxtaposition of the words "abstract" and "concrete," reasoning that *Press* stood not for the proposition that a disqualifying interest must be financial but rather that it must be concrete. As the *Williams* court commented after quoting the above passage: "There was nothing abstract and everything concrete about the interests so tenaciously asserted by this appellant in the court below. Those interests related directly to a specific piece of real property owned by him: his family home." (*Williams, supra*, 74 Cal.App.4th at p. 970.)

In *Families Unafraid, supra*, 79 Cal.App.4th 505, the court, with the *Press* quote in mind, stated that "an aesthetic or environmental interest will not be considered sufficient to block an award of attorney fees under the financial burden criterion unless certain conditions are met. That interest must be specific, concrete and significant, and these attributes must be based on objective evidence. In short, for an aesthetic or environmental interest to block an award of attorney fees under the financial burden criterion, that interest must function essentially in the same way in the comparative analysis as a financial interest, clearly an objective interest. A subjective, vaguely grounded aesthetic interest, even if 'heart-felt,' will not be considered sufficient; nor will a mere abstract interest in aesthetic integrity or environmental preservation suffice to block an award of attorney fees." (*Families Unafraid,*

*supra*, 79 Cal.App.4th at p. 516, italics omitted; accord, *Hammond, supra*, 99 Cal.App.4th at pp. 125–126.)

Nothing in *Press* supports this construction of section 1021.5. *Press* did not hold that a "concrete," as opposed to an "abstract," nonfinancial interest may disqualify a litigant from a fee award under section 1021.5; it merely observed that some sort of concrete interest was necessary to establish standing to bring the action. (*Press, supra*, 34 Cal.3d at p. 321, fn. 11.) More importantly, the amenability of that footnote to the interpretations advanced by the Courts of Appeal above is ultimately irrelevant to our task of construing the statute itself. As discussed, the statutory language focuses on "financial burden," not on the nonfinancial motives a litigant may have in bringing the suit.

■ Although a statute should not be literally construed if to do so would lead to absurd results or defeat the statute's evident purpose (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 27 [109 Cal.Rptr.3d 329, 230 P.3d 1117]), a literal construction would not do so here. Rather, it is the construction placed on that statute by the *Williams* line of cases that would frustrate the purpose of section 1021.5. We can conceive of only two reasons for permitting section 1021.5 fees in cases where litigants have "abstract" interests but not when they have "concrete" nonpecuniary interests. The first would be that in the case of strong "concrete" interests, such fees would not be needed to encourage the litigation to go forward. (See *Punsly, supra*, 105 Cal.App.4th at p. 118.) But as discussed, section 1021.5 is primarily concerned not with the problem of a litigant's lack of motivation to pursue public interest litigation but with the infeasibility of doing so because of large attorney fees and nonpecuniary outcomes that make "these cases . . . prohibitively expensive for almost all citizens." (Dept. of Consumer Affairs, Enrolled Bill Rep. on Assem. Bill No. 1310 (1977–1978 Reg. Sess.) prepared for Gov. Brown (Sept. 28, 1977) p. 2.) Such infeasibility due to prohibitive expense is not altered when a litigant happens to be motivated by a "concrete" nonpecuniary interest.

The second possible reason for permitting attorney fees for cases with "abstract" but not "concrete" interests is some kind of normative concern that cases that benefit the public interest that are impelled by the litigant's selfish motives are in some way not authentic public interest cases and do not deserve the benefit of section 1021.5's fee-shifting provisions. There is no indication in the language of the statute nor in its legislative history that the Legislature shared these normative concerns. On the contrary, section 1021.5 from all indications appears to be focused, as discussed, on solving the problem of the nonaffordability of litigation that will benefit the public but cannot pay its own way. Therefore, construing section 1021.5 literally to

focus on financial burdens and offsetting benefits rather than on nonpecuniary motives does not subvert the statute's evident purpose, but, on the contrary, advances it.

Furthermore, it is inherently problematic to forge a coherent doctrine around the notion that nonpecuniary interests may disqualify litigants from section 1021.5 fees. First, it is difficult to discern what interests qualify as sufficiently "concrete." (See *Families Unafraid, supra*, 79 Cal.App.4th at pp. 527–528 (conc. & dis. opn. of Sims, Acting P. J.).) If, for example, there is environmental litigation that results in preserving open space, does a litigant have a sufficiently concrete interest if he or she currently enjoys the use of that open space, but abstract if a litigant visits that open space rarely or not at all? What if he or she may enjoy it at some point in the future? Would county jail inmates who successfully sued to obtain at least three hours per week of exercise be precluded from obtaining attorney fees because the litigation has yielded a concrete benefit for them? (See *Daniels v. McKinney* (1983) 146 Cal.App.3d 42 [193 Cal.Rptr. 842] [awarding attorney fees under that circumstance].) Would a student who changes a school's policy of excluding students with AIDS from the classroom be barred from obtaining attorney fees because he or she concretely benefits from this result? (*Phipps, supra*, 204 Cal.App.3d 1110 [awarding attorney fees under that circumstance].) The only inquiry suggested by the *Williams* line of cases is whether this is the type of interest that is so strong that no other incentive would be needed to pursue the litigation. (See *Punsly, supra*, 105 Cal.App.4th at p. 118.) But this inquiry is inherently speculative and lacking in objective criteria. Furthermore, this inquiry entirely ignores the central problem that section 1021.5 seeks to address: the inherent unaffordability of legal services for public interest cases yielding primarily nonpecuniary benefits.

Another weakness in the position of *Williams* and its progeny is that such interests "are incapable of reasonably accurate valuation." (*Families Unafraid, supra*, 79 Cal.App.4th at p. 527 (conc. & dis. opn. of Sims, Acting P. J.).) As even the majority in *Families Unafraid* conceded: "Admittedly, environmental or aesthetic interests are not easily quantified so as to compare them to the cost of litigation" (*Families Unafraid, supra*, 79 Cal.App.4th at p. 515)—a statement equally true of other nonpecuniary interests. As explained above, the central calculus of the financial burden requirement—an evaluation of the costs of the litigation with its expected value (*Los Angeles Police Protective League, supra*, 188 Cal.App.3d at pp. 9–10)—depends on an ability to quantify the gains realistically expected. Without any objective basis for quantification, we are left with the subjective opinions of trial courts, which well may vary considerably. For example, in *Punsly*, the prevailing party requested approximately $58,000 for legal services, part of which she was responsible for, part of which had been provided pro bono. (*Punsly, supra*, 105

Cal.App.4th at p. 108.) As stated above, the litigation vindicated her constitutional right to deny grandparental visits for her child. The court, in denying the attorney fees, stated: "In light of the proportionality test which compares the strength of the private interest with the cost of litigation, we cannot say the trial court erred in concluding that Ho's stake in the litigation was roughly proportionate to the cost, and that she and her counsel are not entitled to this form of relief." (*Id.* at p. 118.) The court did not explain how it arrived at that conclusion and did not address the valuation or proportionality problems. Perversely, the rule in *Punsly* and like cases may lead public interest attorneys to favor cases brought by litigants with minor, quantifiable financial interests in public interest litigation over those brought by litigants with nonquantifiable nonpecuniary interests, given the inherent uncertainty and hence greater risk of being denied attorney fees in the latter class of cases, even though litigants in the former class may bear a lesser financial burden. This anomaly is surely at odds with the statute's purpose of alleviating the financial burden of bringing public interest lawsuits.[4]

■ Turning to the present case, we hold that the fact that Maldonado was subjectively motivated by her brother's welfare or other personal concerns does not disqualify her from section 1021.5 fees. But this holding does not resolve the case. The trial court also decided that the litigation had failed to confer a substantial benefit on the general public or a large class of persons. Because the Court of Appeal upheld the trial court's decision solely on the basis of the failure to fulfill the necessity and financial burden requirement, it had no occasion to decide the substantial benefit issue and should do so on remand.

Moreover in this case, as the Court of Appeal noted, Maldonado litigated the jurisdictional issue only belatedly, after the court requested it do so. (See *Whitley I, supra,* 155 Cal.App.4th at p. 1458, fn. 6.) Maldonado's attorneys contend that they would have raised the jurisdictional issue without the Court of Appeal's prompting. Whatever the case, the fact remains that even if it is determined on remand that some fees should be awarded, the court may legitimately restrict the award to only that portion of the attorneys' efforts that furthered the litigation of issues of public importance. (See, e.g., *Saleeby v. State Bar* (1985) 39 Cal.3d 547, 574 [216 Cal.Rptr. 367, 702 P.2d 525]; *Hammond, supra,* 99 Cal.4th at pp. 132–133.)[5]

---

[4] We therefore disapprove of *Williams v. San Francisco Bd. of Permit Appeals, supra,* 74 Cal.App.4th 961, *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors, supra,* 79 Cal.App.4th 505, *Hammond v. Agran, supra,* 99 Cal.App.4th 115, and *Punsly v. Ho, supra,* 105 Cal.App.4th 102 to the extent they conflict with this opinion. Whether the results in those cases were correct on other grounds is beyond the scope of this opinion.

[5] Maldonado requests that we award section 1021.5 fees for the present fee litigation. Of course, if Maldonado is determined to be eligible for section 1021.5 attorney fees for the

## III. Disposition

The judgment of the Court of Appeal is reversed and the cause is remanded for proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

---

litigation in connection with her brother's placement (hereafter referred to as the *Whitley* litigation), it is well established that the attorney fees for work necessary to recover those fees, such as reasonable effort expended on the present appeal, are to be included in the fee award. (See *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 580 [21 Cal.Rptr.3d 331, 101 P.3d 140].) But Maldonado's request goes further, contending that even if she is not awarded attorney fees in connection with the *Whitley* litigation, she should be independently awarded attorney fees for the present litigation regarding the proper construction of section 1021.5 (hereafter the section 1021.5 litigation). There is no reason in principle why a litigant and her attorney cannot obtain section 1021.5 fees for litigating a significant issue regarding the proper construction of section 1021.5. What is less clear is whether the litigation in this case meets the "financial burden" requirement of that statute. If fees are to be awarded for the section 1021.5 litigation itself, when there are no fees awarded in the *Whitley* litigation, then the financial incentives for the former litigation—the expected financial gain even when the expectations are not realized—must be considered. Here, the expected financial gain was a substantial attorney fee award. Because we have no information before us about attorney fees for litigating the section 1021.5 issue, we cannot discern on this record whether the costs of that litigation are out of proportion to the financial stake. On remand, therefore, the court is to award reasonable attorney fees for the section 1021.5 litigation if it determines that attorney fees for the *Whitley* litigation are warranted, or if it determines that the section 1021.5 litigation, independently considered, meets the financial burden requirement of section 1021.5, as well as the statute's other requirements.