Filed 7/21/25  In re D.W. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| In re D.W., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>D.W.,<br><br>    Appellant;<br><br>A.W. et al,<br><br>    Defendants and Respondents. | F089236<br><br>(Super. Ct. No. 515690)<br><br>**OPINION** |

<u>**THE COURT**</u>*

APPEAL from an order of the Superior Court of Stanislaus County.  Annette Rees, Judge.

Jamie A. Moran, under appointment by the Court of Appeal, for Appellant.

No appearance for Defendant and Respondent A.W.

No appearance for Defendant and Respondent L.W.

---

\*        Before Detjen, Acting P. J., DeSantos, J. and Fain, J.†

†        Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Thomas Boze, County Counsel, and Sophia Ahmad, Deputy County Counsel, Gordon-Creed, Kelley, Holl, & Sugerman, Jeremy Sugerman and Anne H. Nguyen, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Minor D.W. appeals from a postpermanency dependency review hearing. On July 17, 2024, D.W. left her placement in a short-term residential therapeutic program (STRTP) and had not been located by the time of the hearing. D.W., through counsel, argues the Stanislaus County Community Services Agency (the agency) failed to use reasonable efforts to locate her. D.W. further argues the agency did not comply with its duties of initial inquiry pursuant to the Indian Child Welfare Act (ICWA). We find the juvenile court did not abuse its discretion when it found the agency used reasonable efforts to locate D.W., but conditionally reverse and remand so that the agency can comply with its duties pursuant to ICWA.

## STATEMENT OF FACTS[1]

D.W. first came to the attention of the agency on March 5, 2010, when she was 14 months old. D.W. was detained pursuant to a subsequent petition filed in 2013, which alleged mother was " 'pimping out' " one of her daughters and was allowing D.W.'s father, a registered sex offender, to live in the home. For the next 14 years, D.W. moved through various placements, with some contact with her mother and no contact with her father. In 2022, D.W. began to suffer from behavioral problems and placement instability. The agency and D.W.'s caregiver reported that mother and maternal relatives negatively influenced her.

D.W. was moved to a STRTP on June 20, 2023, but left the placement on July 25, 2023. She then moved through several other STRTP placements, and was finally placed

---

[1] We summarize the facts relevant to the issues presented in this appeal.

in a STRTP in Placerville on April 15, 2024.  On June 4, 2024, the agency indicated D.W. was suffering from behavioral issues and had to be moved to another placement within the same program.  On July 17, 2024, D.W. left her STRTP placement, and the agency was concerned she may have been in the company of her mother and a man suspected of involvement in the commercial sexual exploitation of children (CSEC).

On July 18, 2024, the agency filed a request for a protective custody warrant, stating that D.W. left her placement and had not returned.  The agency also requested authorization to provide a photograph of D.W. and identifying information to law enforcement and to the Black & Missing Foundation hotline.  At a hearing on July 26, 2024, the juvenile court granted the agency's request to place D.W. in a STRTP placement and noted that she remained AWOL.  Mother and maternal grandmother were present at the hearing and the juvenile court made ICWA inquiries.

In a STRTP placement review report filed on August 22, 2024, the agency indicated on July 26, 2024, new information was brought forth by D.W.'s maternal grandmother of possible Native American heritage which was identified on a DNA home testing kit.  The agency sent letters on August 6, 2024, to the State Department of Social Services Office of Tribal Affairs and the Bureau of Indian Affairs, and as of August 21, 2024, had not collected any additional ICWA information.  The report stated D.W. remained AWOL.

The report also stated that a child and family team (CFT) meeting was convened as a part of the case planning and development.  The CFT also included "teaming" for "Run Away Search Efforts."  The CFT with search efforts was conducted on August 7, 2024, but D.W.'s family, while invited, was unavailable.  The next CFT was scheduled for August 28, 2024.

A placement review hearing was held on September 4, 2024.  The juvenile court found D.W. had run away from her approved placement on July 17, 2024, and set a runaway review hearing for October 17, 2024.  The court found the agency had complied

with the case plan by making reasonable efforts, including steps necessary to finalize the permanent plan, and had made reasonable efforts to locate D.W.

A status review report filed on October 7, 2024, indicated that when D.W. left her placement, she told a peer she was going to live with her mother. On July 23, 2024, the agency filed a missing person report with the National Center for Missing and Exploited Children (NCMEC) and the Black & Missing Foundation. On July 22, 2024, the agency verified with the STRTP that D.W. may be with a peer in Walnut Creek, and on July 24, 2024, the agency contacted the Walnut Creek Police Department and requested a welfare check. The welfare check was conducted on July 25, 2024, but the officer did not locate D.W.

On July 24, 2024, the agency partnered with the Modesto Police Department and the Stanislaus County Sheriff's Department to request welfare checks at all known addresses—D.W.'s grandmother, mother, and adult siblings. An officer conducted a welfare check at the grandmother's home and completed a home inspection, but D.W. was not found. There was no one home at the last known address of one of her sisters, and the individual living at the address provided for another sister stated they did not have any knowledge of the sister or D.W.

On August 8, 2024, the agency located two separate social media accounts for D.W., but both had no recent activity. No other known social media accounts were located. On August 12 and 20, 2024, the agency contacted D.W.'s sister, G.F., who reported no knowledge of D.W.'s whereabouts and stated she had not seen D.W.

The report indicated mother lives in a travel trailer in various locations around Modesto. Mother does not have a fixed physical address, but occasionally stays with maternal grandmother. G.F. stated she had moved to Sacramento, but declined to provide her physical address.

On October 29, 2024, the juvenile court held a runaway review hearing and a section 366.3 dependency review hearing. The court ordered the agency perform welfare

checks on D.W.'s known relative's addresses and found the agency had made reasonable efforts and acted with due diligence to locate D.W.

The agency filed a status review report on January 8, 2025. D.W. remained AWOL and her whereabouts were unknown. On October 28, 2024, the agency provided an update to D.W.'s NCMEC case manager, and on November 1, 2024, an NCMEC resource specialist requested an update and provided the contact information for the child sex trafficking recovery services team. On November 5, 2024, the agency received a completed address search, but no new addresses were provided.

On November 6, 2024, D.W.'s photo was provided for a search of the known CSEC databases with facial recognition, but no records were found due to poor photo quality. On November 22, 2024, mother and one of D.W.'s adult siblings requested D.W.'s belongings, but were informed the agency would keep the belongings to give to D.W. when she returned. Mother stated she had not seen nor heard from D.W., and she was concerned she was in Los Angeles. Mother could not identify any individuals D.W. might know in Los Angeles for the agency to follow up with.

On December 3, 2024, the agency requested the West Sacramento Police Department conduct a welfare check at the address associated with G.F. Officers went to the address but there was no one home and none of the vehicles at the location were associated with G.F.

On December 3, 2024, the agency also requested the Modesto Police Department conduct a welfare check of the maternal grandmother's home. D.W. was not present and grandmother said D.W. had not been to her home in several months. On December 5, 2024, D.W.'s photo was put through the Stanislaus County Sheriff's Department's facial recognition program with no results.

On January 22, 2025, the juvenile court held a section 366.3 and runaway review hearing. The agency had no updates about D.W. or her whereabouts. Counsel for D.W. requested the juvenile court find the agency had not made reasonable efforts to locate

5.

D.W., because there had been no efforts other than contact with law enforcement, and no social media searches. There was also no evidence in the report that the agency attempted to get another photo of D.W. to run through the CSEC system. Counsel requested another runaway review in 45 days so that the agency could make the requested efforts to find D.W.

The juvenile court found there were many efforts documented in the reports from October going forward as far as contacts with law enforcement and NCMEC, but not a lot of detail regarding social media. The court found this did not contradict a finding of reasonable efforts and due diligence but agreed with D.W.'s counsel to hold a runaway review hearing in 45 days. The juvenile court found the agency had made reasonable efforts and due diligence to locate D.W., and ordered the agency to continue to make reasonable efforts to finalize the permanent plan.

## DISCUSSION

### I. Request for Judicial Notice Is Granted in Limited Part

On April 22, 2025, the agency filed a request for judicial notice of an interim review report filed in the juvenile court on March 5, 2025, and a minute order from a runaway review hearing held on March 10, 2025. D.W. opposed the request.

Pursuant to Evidence Code section 459, subdivision (a), this court may take judicial notice of any matter specified in Evidence Code section 452 and may take judicial notice of a matter in a tenor different from that noticed by the trial court. Likewise, this court "shall take judicial notice of (1) each matter properly noticed by the trial court and (2) each matter that the trial court was required to notice under [s]ection 451 or 453." (Evid. Code, § 459, subd. (a).)

Evidence Code section 452, subdivision (d) permits judicial notice of the "[r]ecords of (1) any court of this state or (2) any court of record of the United States." Evidence Code section 453 requires a court to take judicial notice of "any matter

6.

specified in [s]ection 452 if a party requests it" and gives each adverse party sufficient notice, and furnishes the court with sufficient information to enable it to take judicial notice of the matter.

D.W. urges this court to deny the agency's request for judicial notice, relying on *In re Kenneth D.* (2024) 16 Cal.5th 1087.  In *Kenneth D.*, the Placer County Department of Health and Human Services requested that the appellate court augment the record on appeal to add the juvenile court's postjudgment efforts to comply with ICWA to the appellate record.  (*Id*. at pp. 1095, 1096.)

The Supreme Court in *Kenneth D.* found "[e]vidence of a postjudgment inquiry also is not a proper subject of augmentation or judicial notice.  A reviewing court may order the appellate record augmented to include '[a]ny document filed or lodged in the case in superior court ….' (Cal. Rules of Court, rule 8.155(a)(1)(A).)[2]  However, '[a]ugmentation does not function to supplement the record with materials not before the trial court' when it made its order.  [Citations.]  Although the department lodged its memo with the juvenile court, it did so only after that court's judgment, when the case was already on appeal.  'The augmentation procedure cannot be used to bring up matters occurring during the pendency of the appeal because those matters are outside the superior court record.' [Citation.]  Similar reasoning applies to judicial notice requests: ' "Reviewing courts generally do not take judicial notice of evidence not presented to the trial court" absent exceptional circumstances.' [Citations.]  …  Further, a court ' " 'may take judicial notice of the existence of each document in a court file, but can only take judicial notice of the truth of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments.' " ' [Citation.]  The department's postjudgment memo did not constitute such a document." (*In re Kenneth D.*, *supra*, 16 Cal.5th at p. 1106.)

---

**2**      Undesignated references to rules are to the California Rules of Court.

Although the motion for judicial notice in the instant case does not relate to the ICWA issue presented, but rather to D.W.'s argument that the agency did not make reasonable efforts to locate her, we nonetheless find *Kenneth D.* controlling. Evidence Code section 453 compels this court to take judicial notice of the records of the juvenile court, and we specifically take judicial notice of the existence of a report titled "INTERIM REVIEW REPORT," which was filed with the juvenile court on March 5, 2025, and the minute order from a runaway review hearing held on March 10, 2025. However, we do not take judicial notice of the truth of the facts asserted in the report. In the minute order, for purposes of determining mootness, we only take judicial notice of the fact that as of March 10, 2025, D.W. remains AWOL.[3]

We do not otherwise consider the contents of the documents judicially noticed, as these documents are outside the juvenile court record and were not presented to the court on January 22, 2025. The agency has likewise not presented any exceptional circumstances which might warrant a more expansive judicial notice of the aforementioned documents.

II.     <u>**The Juvenile Court Did Not Abuse Its Discretion Finding the Agency Made Reasonable Efforts to Locate D.W.**</u>

D.W. argues the agency did not make reasonable efforts to locate her prior to the January 22, 2025 hearing. She argues the agency did not make sufficient efforts to locate her through social media, or to find a suitable photo for facial recognition searches. Finally, she argues the agency did not make any efforts to locate her in Los Angeles.

Section 366.3, subdivision (d) requires, where the child is in a placement other than the home of a legal guardian and jurisdiction has not been dismissed, that "the status of the child shall be reviewed at least every six months." (§ 366.3, subd. (d)(1).) At such a hearing, the juvenile court shall inquire about the progress being made to provide a

---

[3]     Because D.W. has not been located we find the appeal is not moot.

8.

permanent home for the child, shall consider the safety of the child, and shall determine "[t]he extent of the agency's compliance with the child welfare services case plan in making reasonable efforts either to return the child to the safe home of the parent or to complete whatever steps are necessary to finalize the permanent placement of the child." (§ 366.3, subd. (e)(4).)[4]

There is no specific statutory duty imposed on a county welfare agency to locate runaway minors. With regards to nonminors, the county welfare agency has a duty to document reasonable efforts made to locate the nonminor when the nonminor is unavailable, in order to ensure the nonminor is present in court for hearings. (§ 391, subd. (d)(1).) There is no comparable statute for minors. Because there is no separate, statutory duty for the agency to locate D.W. during postpermanency proceedings, we interpret the agency's duty as part of its general duty to make "reasonable efforts … to complete whatever steps are necessary to finalize the permanent placement of the child." (§ 366.3, subd. (e)(4).) Locating D.W. would necessarily be required to finalize her permanent placement.

The law regarding what constitutes reasonable efforts to locate a runaway minor is not well developed. There are no published cases analyzing the issue, and the term "reasonable efforts" is not itself defined. In interpreting the statute, " '[w]e begin with the statutory language because it is generally the most reliable indication of legislative intent. [Citation.] If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citation.]' [Citation.] But if the statutory language may reasonably be given more than one interpretation, courts may employ various extrinsic aids, including a consideration of the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory

---

[4]    The juvenile court is likewise required to determine "[w]hether or not reasonable efforts to make and finalize a permanent placement for the child have been made." (§ 366.3, subd. (e)(11).)

scheme encompassing the statute." (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214.)

We also "interpret the language in the context of the entire statute and the overarching statutory scheme, and we give significance to every word, phrase, sentence and part of an act in discerning the legislative purpose." (*In re B.H.* (2016) 243 Cal.App.4th 729, 736.)

Within the juvenile dependency statutory scheme, the term "reasonable efforts" appears during pre-permanency proceedings, when a minor is removed from the custody of their parents. Section 361, subdivision (e) directs a juvenile court to determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home …." In this context, "reasonable efforts, like reasonable services, need only be reasonable under the circumstances, not perfect." (*In re H.E.* (2008) 169 Cal.App.4th 710, 725.) " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1159.)

The term also appears in section 361.5, subdivision (b)(10)(A), which states that reunification services need not be provided to a parent or guardian when the court finds, by clear and convincing evidence, "[t]hat the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to [s]ection 361 and … according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian."

In this context, the "reasonable effort" requirement "focuses on the extent of a parent's efforts, not whether he or she has attained 'a certain level of progress.' " (*R.T. v.*

*Superior Court* (2012) 202 Cal.App.4th 908, 914.) " 'To be reasonable, the parent's efforts must be more than "lackadaisical or half-hearted" ' " (*Ibid*.) Likewise, the " 'reasonable effort to treat' standard 'is not synonymous with "cure." ' " (*Ibid*.)

We therefore interpret the plain meaning of the term "reasonable efforts," as it appears in section 366.3, subdivision (e)(4)[5] and in the context of the overarching juvenile dependency scheme, as efforts which, while not perfect or ideal, were reasonable under the circumstances. We also do not interpret "reasonable efforts" to find a runaway minor require a certain level of progress or success to be sufficient.

The juvenile court's finding of "reasonable efforts" pursuant to both section 361, subdivision (e) and section 361.5, subdivision (b)(10)(A) is reviewed for substantial evidence. (See *In re H.E.*, *supra*, 169 Cal.App.4th at p. 725; *R.T. v. Superior Court*, *supra*, 202 Cal.App.4th at p. 914.) The agency points out, however, that the standard of review in postpermanency proceedings may differ, relying on *In re Christian K.* (2018) 21 Cal.App.5th 620 (*Christian K.*).

In *Christian K.*, the mother's parental rights to the minor were terminated and adoption was selected as the permanent plan. (*Christian K.*, *supra*, 21 Cal.App.5th at p. 622.) At a postpermanency review hearing pursuant to section 366.3, the minor disagreed that he had received reasonable services, and argued he needed additional therapy. (*Id*. at p. 625.) The minor had only received a few therapy sessions, and his pending adoption would result in him moving to Denmark. (*Id*. at pp. 624–625.) The juvenile court noted that no contested hearing had been set, and found reasonable services had been provided and ordered a 30-day trial visit to Denmark to visit the home of the paternal grandparents. (*Id*. at pp. 625–626.) The minor appealed, arguing the juvenile court failed to exercise its discretion when it found reasonable services. (*Id*. at p. 626.)

---

[5]     And, by extension, this interpretation applies throughout section 366.3.

11.

The appellate court affirmed the juvenile court's order. "Section 366.3, which governs this stage, does not mandate a particular consequence if adequate services are not provided. [Citation.] [T]he statute directs the juvenile court to 'determine' the 'adequacy of services provided to the child' (§ 366.3, subd. (e)(6) ) and to 'make appropriate orders to protect the stability of the child and to facilitate and expedite the permanent placement and adoption of the child.' (§ 366.3, subd. (g).) Because no consequence is mandated for the failure to provide reasonable services, the statute confers discretion upon the court to issue any appropriate order to protect a child's stability and to expedite the child's permanent placement—which may or may not include further services—regardless of whether services are found to have been wanting." (*Christian K.*, *supra*, 21 Cal.App.5th at p. 627.) The appellate court reviewed the juvenile court's order for abuse of discretion and found so long as the juvenile court considered and made a determination about the minor's services, it was authorized to order the trip to Denmark even if "the services were imperfect, unreasonable, or inadequate." (*Id*. at p. 628.)

We follow *Christian K.* and review the juvenile court's finding that the agency made reasonable efforts and due diligence to locate D.W. for an abuse of discretion. We find no error. The juvenile court considered the agency's duty to make reasonable efforts to find D.W., and although, as D.W. argues, there was more the agency could have done, the efforts need not be perfect. The record reflects the agency made significant attempts to locate D.W., reached out to law enforcement in several counties, checked some social media, checked available databases, and repeatedly checked in with D.W.'s acquaintances and relatives.

D.W. points to cases discussing the general goals of the juvenile dependency system, which primary focus is "the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (§ 300.2) She also relies on *In re Natasha H.* (1996) 46 Cal.App.4th 1151 (*Natasha H.*), arguing that her runaway status is not a reason to relieve the agency of its duties under the law.

In *Natasha H.*, the minor was adjudged a dependent child after her mother, a homeless heroin addict, could no longer provide her with proper care or supervision. (*Natasha H.*, *supra*, 46 Cal.App.4th at p. 1153.) The minor became a habitual runaway and it was also reported the minor had been arrested for burglary and possession of stolen property and was the subject of a section 602 proceeding where it was alleged the minor committed attempted murder and received stolen property. (*Id.* at pp. 1153, 1154, 1155, fn. 1.) The department of health and human services recommended termination of the minor's dependency status, stating that the minor had been AWOL from her placement for approximately two years, and was uncooperative and resistant to placement. (*Id.* at p. 1154.) The juvenile court granted the request, finding that continued dependency "would be an illusory act in that this minor has demonstrated she has no intention of cooperating with the services of the department .…" (*Ibid.*)

The appellate court reversed. "Obstinacy and defiance test the patience of adults charged with the tending to the needs of minor children. Under the trial court's reasoning the more obstinate the child the greater the justification for terminating jurisdiction. We disagree. As much as the minor might wish to be rid of court supervision, and as frustrating as her conduct might be to DHHS and the court, her misbehavior and lack of cooperation do not justify termination of her dependency status absent extraordinary circumstances not present here that make it in her best interest to do so." (*Natasha H.*, *supra*, 46 Cal.App.4th at p. 1158.)

Unlike in *Natasha H.*, in this case, neither the agency nor the juvenile court seeks to terminate D.W.'s dependency status. The record does not reflect that any such request has ever been made, and efforts to locate D.W. are ongoing. The agency did not indicate it was ceasing its attempts to locate D.W., and the court ordered the agency to continue to make reasonable efforts to locate her. The agency is not being relieved of its duties under the law, and the court's finding that the agency made reasonable efforts to locate D.W.

was not an abuse of its discretion to "facilitate and expedite [her] permanent placement." (§ 366.3, subd. (g).)

## III.    Remand for Further ICWA Inquiry Is Required

Faced with continuing difficulties and inconsistencies in this area of ICWA, the Legislature enacted Assembly Bill No. 81 (2023–2024 Reg. Sess.), effective September 27, 2024.  Assembly Bill No. 81 "create[d] a comprehensive act to protect and preserve Indian families in California and to aid in improving implementation of applicable state and federal laws."  (§ 224, subd. (c).)  The legislation expressly recognized, "Despite the passage of the federal Indian Child Welfare Act of 1978, Senate Bill [No]. 678 [(2005–2006 Reg. Sess.)] (Stats. 2006, [c]h. 838), and Assembly Bill [No]. 3176 [(2017–2018 Reg. Sess.)] (Stats. 2018, [c]h. 833), California continues to experience inconsistent implementation of the Indian Child Welfare Act and its related state law protections, thus continuing the harm and breakup of Indian families.  Variation in practice undermines tribal sovereignty, furthers destructive impacts on tribes and tribal communities, puts the lives of Indian children and families at disproportionate risk for multiple adverse outcomes, and fails to address systemic racism."  (*Id*., subd. (b).)  In addition to advancing the goals of clarity and consistency under California law (§ 224, subd. (c)), Cal-ICWA resolved the split of appellate authority over whether or not the duty of initial inquiry under section 224.2, former subdivision (b), arises when a child is taken into protective custody by warrant under section 340, expressly providing that it does (*id*., subd. (b)(2)).  (See *In re Jerry R.* (2023) 95 Cal.App.5th 388, 403–404 [addressing *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743 & *In re Delila D.* (2023) 93 Cal.App.5th 953, & agreeing with *Delila D.* that the duty of initial inquiry applies regardless of how the child is taken into custody].)

As amended, section 224.2 provides, in relevant part, "The court, county welfare department, and the probation department have an affirmative and continuing duty to

inquire whether a child for whom a petition under [s]ection 300, 601, or 602 may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).) "The duty to inquire begins for a county when first contacted regarding a child, including, but not limited to, asking a party reporting child abuse or neglect whether the party has any information that the child may be an Indian child, and upon a county department's first contact with the child or the child's family, including extended family members as defined in paragraph (1) of subdivision (c) of [s]ection 224.1. At the first contact with the child and each family member, including extended family members, the county welfare department or county probation department has a duty to inquire whether that child is or may be an Indian child." (§ 224.2, subd. (b)(1).)

Section 224.1, subdivision (c)(1) defines "extended family member" as "the same meaning as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached 18 years of age and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent."

The Supreme Court in *In re Dezi C.* (2024) 16 Cal.5th 1112 found that an inadequate Cal-ICWA inquiry requires conditional reversal of a juvenile court's order, with directions to the appropriate agency to conduct an adequate inquiry supported by record documentation. (*Id*. at p. 1136.) D.W. argues the ICWA finding in this case was made on April 8, 2014, over 10 years prior to the imposition of the current initial inquiry requirements. She further argues the agency has relied on this ruling in its reports ever since.

The agency argues that D.W. has not identified a specific defect in the ICWA findings and therefore the order should be affirmed, but recognizes that juvenile courts and child protective agencies have an affirmative and continuing duty to inquire whether a dependent child is or may be an Indian child. The agency likewise acknowledges that the full scope of its ICWA inquiry does not appear to be reflected in the current record on

appeal. Specifically, father had indicated he may have "Blackfoot/Choctaw" ancestry in 2014, but then was absent and had only been located again on September 18, 2024. The record does not indicate whether father's ancestry was otherwise investigated. The agency's initial inquiry, on this record, is therefore inadequate.

Because *Dezi C.* directs conditional reversal in cases where the initial inquiry is insufficient under ICWA, we conditionally reverse the juvenile court's January 22, 2025 order and remand the matter to the juvenile court for compliance with the inquiry and notice requirements of sections 224.2 and 224.3, and the documentation provisions of rule 5.481, subdivision (a)(5).

## DISPOSITION

The juvenile court's January 22, 2025 order is conditionally reversed. The matter is remanded to the court for compliance with the inquiry and notice requirements of sections 224.2 and 224.3 and the documentation provisions of rule 5.481(a)(5), consistent with *In re Dezi C.*, *supra*, 16 Cal.5th 1112, and this opinion. If the juvenile court thereafter finds a proper and adequate further inquiry and due diligence have been conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), then the court shall reinstate the order. If the court concludes ICWA applies, then it shall proceed in conformity with ICWA and California implementing provisions. (See 25 U.S.C. § 1912(a); §§ 224.2, subd. (i)(1), 224.3, 224.4.)